# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

THOMAS LEE BATTLE,
Defendant and Appellant.

S119296

San Bernardino County Superior Court
FVI012605

---

July 1, 2021

Justice Cuéllar authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Corrigan, Kruger, Groban, and Jenkins concurred.

Justice Liu filed a dissenting opinion.

---

PEOPLE v. BATTLE

S119296


Opinion of the Court by Cuéllar, J.


Defendant Thomas Lee Battle was convicted of kidnapping and killing Shirley and Andrew Demko after burglarizing and robbing their home. The jury returned a death verdict, and the trial court sentenced Battle to death. This appeal is automatic. (Pen. Code, § 1239, subd. (b).)[1] Battle contends that the trial court made several errors during the guilt and penalty phases of his trial. We find no error and affirm the trial court judgment.

## I. BACKGROUND

In November 2001, the San Bernardino District Attorney filed an information charging Battle with two counts of murder (§ 187, subd. (a)), one count of first degree residential burglary (§ 459), one count of first degree residential robbery (§ 211), and two counts of kidnapping (§ 207). The information also alleged the following: All the offenses were serious felonies (§ 1192.7, subd. (c)) and violent felonies (§ 667.5, subd. (c)); during the commission and attempted commission of these offenses Battle personally used a knife, a deadly and dangerous weapon (§ 12022, subd. (b)(1)), causing the offenses to be serious felonies (§ 1192.7, subd. (c)(23)); in 1995 Battle suffered a prior conviction for burglary (§ 459), a serious or violent felony (§§ 667, subd. (b),

_____

[1] All statutory references are to the Penal Code unless otherwise noted.

1

1170.12); and in 1997 he suffered a prior conviction for forgery (§ 470) that resulted in a prison term (§ 667.5, subd. (b)). The information also alleged the following special circumstances: Battle committed the murders during the commission of robbery, burglary, and kidnappings (§ 190.2, subd. (a)(17)(A), (G), (M)); and Battle committed multiple murders (§ 190). The jury found Battle guilty on all counts and found true all the special allegations and special circumstances. (The defense and prosecution agreed to stipulate that the prior offense allegations were true.) The jury returned a death verdict. The trial court sentenced Battle to death on the murder counts, to a determinate term for the remaining counts and accompanying enhancements (all of which were ordered to run consecutive to the sentence on the kidnapping count related to the kidnapping of Mr. Demko), and it ordered Battle to pay $10,000 in victim restitution.

## A. Guilt Phase

### 1. The Prosecution's Case

The victims were Andrew Demko and Shirley Demko. They were 77 and 72 years old respectively at the time of their deaths. They had been married for 22 years. Both used a cane and walker; Andrew's hearing was almost gone. Andrew had two adult children from a previous marriage, Denise Goodman and Richard Demko. On or about November 14, 2000, the mailperson noticed that the Demkos had not collected the previous day's mail. As the week went on, mail continued to pile up uncollected. Because Thanksgiving was fast approaching and Denise had not heard from Andrew or Shirley, she tried to call them several times but received no response. She called the police to ask them to check on her parents. The police reported

that the Demkos' car wasn't there and that their dogs were locked in a room, but that everything looked fine. But her parents' neighbor told her that day that he had noticed newspapers stacking up in the Demkos' yard. Concerned, Denise called the police back and once again asked them for another check on her parents.

Meanwhile, on November 18, a man and his son were hunting in the San Bernardino desert when they found a man lying dead on the ground. Police officers with the San Bernardino County Sheriff's Office responded to the scene and, with the assistance of a highway patrol aircraft, they also found a dead woman about 200 yards away from the man. The bodies were later identified as Andrew and Shirley Demko. (One of the officers who was present at the desert heard radio traffic concerning the second welfare check at the Demko residence, and he thought there might be a connection between that and the bodies found. He then went to the residence, and he recognized a picture on the wall of Mr. Demko as the same man he had seen dead in the desert.)

Mr. Demko was found lying face up. He was wearing blue pajamas, a blue bathrobe, and a single blue slipper. There was blood on the chest area of his shirt. His other slipper was found nearby on disheveled ground that showed signs of scuffing and dragging. An autopsy revealed he died from strangulation and a stab wound to the neck. The stab wound was four and a half inches deep on the right side of the neck, and it was consistent with a wound from a single-edged knife. He had abrasions and bruising on his forehead, which were caused by blunt force, and on his chin and neck, which were caused by strangulation. He also had injuries to his hands, wrists, arms, knees, and feet. Some of these injuries were consistent with defensive wounds,

some with his having been bound, and others with his having been dragged.

Mrs. Demko was found lying face down. She was also wearing pajamas, which had blood on them. Much of the upper half of her body had been eaten by wild animals, so only a small number of internal organs remained. The autopsy revealed that her cause of death was homicidal violence of undetermined etiology. Because significant portions of her body were missing, the specific mechanism of death could not be determined. Her hands were duct-taped together, and they had signs of blunt-force trauma and cuts. Injuries to her feet and ankles were consistent with her having been restrained with bindings or zip ties. Police later found zip ties and bloodstained duct tape in the area.

After being contacted by the police, Denise and Richard accompanied officers to the Demkos' home. The TV, VCR, and stereo speakers were missing. On the dining room table, they found a cup of coffee, a burned cigarette, reading glasses, and an open newspaper dated November 13. Denise explained that ever since she was a child, her father would wake up early each morning and read the paper while drinking coffee. Police also found six unwrapped Los Angeles Times newspapers (dated November 14–19) and one Desert Times newspaper (dated November 14) stacked in a corner of the dining room. In the kitchen trash can, police found two FedEx delivery slips. One was dated November 21 — three days after the Demkos' bodies were found — which indicated that someone had been in the house after the murders. Finally, the Demkos' car, a blue Mercury Sable, was still missing.

On the evening of November 25, police pulled over a woman driving the Demkos' car. A later inspection of the car revealed blood stains on the inside of the trunk lid, as well as items including the Demkos' credit cards and boxes of checks. The woman told police that she had borrowed the car from Battle, who was a close friend of her roommate, Jenica McCune, and who was at their apartment. According to McCune, she had not been in contact with Battle for about a year before he unexpectedly showed up to her apartment on around November 13, or perhaps November 15 or 16. She said he had a blue Ford Taurus (which an insurance agent testified looked like a Mercury Sable), and that he told her he had bought the car but had not yet registered it.

Police went to McCune's apartment and arrested Battle. Detectives Michael Gilliam and Derek Pacifico took Battle to the police station and interrogated him in the early morning hours of November 26. In total, Battle had four taped interviews with officers: two with Detectives Gilliam and Pacifico, on November 26 and the morning of November 27; a subsequent one with special investigator Robert Heard as part of a polygraph examination on November 27; and a final one on November 27, again with Detectives Gilliam and Pacifico. Battle was advised of and waived his *Miranda* rights at the beginning of the November 26 interview and again at the beginning of the first interview on November 27. Over the course of the four interviews, Battle told several different versions of events regarding his involvement in the Demkos' murder. At trial, the officers testified about, and the prosecution played redacted audiotapes of, Battle's custodial statements. The recordings were admitted into evidence. The transcripts of the recordings the jury heard were given to the jury for reference and admitted

into evidence with the understanding that they would be sent back to the jury room only if the jury requested them.

In the first interview, beginning at 1:13 a.m. on November 26, Detective Gilliam informed Battle that he wanted to talk about the car that Battle had lent to McCune's roommate. Battle said that his friend Neal[2] had lent him the car when they ran into each other and Neal heard that he had been laid off and didn't have transportation. Battle borrowed the car several times prior to being arrested. Neal apparently showed Battle some boxes in the car's trunk, which contained checks, credit cards, and ID cards with male and female names. He asked if Battle wanted to make some money, but Battle declined and explained he was trying to "fly straight." Battle knew Neal was doing "some real foul things." He also told officers that "Left Eye," a woman he had not known for very long, had asked him to store a TV and VCR for her while she moved. Battle said he stored the TV and VCR at his home for a couple of days and then returned them to her. (Battle was living at the time in the Christian Living Home on Rancherias Road, less than two miles from the Demkos. The home was a group residence primarily for parolees, run by a Christian outreach group.)

The officers told Battle that the owners of the car Battle had been driving had been found dead in the desert, their home had been broken into and their TV and VCR were missing, and someone knew Battle had the car on November 13, the day the

---

[2] The name "Neal" is spelled in two ways in the record (also as "Neil"). We adopt the version used by the parties, who have chosen the spelling that first appears in the interrogation transcript.

owners went missing. Battle denied involvement and said he didn't kill anyone. He said he didn't know if Neal and Neal's friends were involved, but he knew another person in his house, Perry Washington, was involved "[w]ith the credit cards and stuff." He also said Washington asked him if he wanted to make some quick cash by pawning a TV, VCR, and speakers. Since he was already pawning some of his own possessions, including his sword collection, he picked up the TV, VCR, and speakers from Neal on November 17 or 18 and pawned the TV and VCR at the Bear Valley Pawn Shop. (He did not pawn the speakers because they were needed for an upcoming church service.) He insisted that the only thing he was asked to do, and only thing he did, was pawn the items.

At this point in the first interview, the tape recording of the interrogation stopped, likely because of a technical failure. When this interview resumed about 90 minutes later, Battle's version of events changed dramatically. He told officers that he and four others — Neal, Left Eye, Neal's brother, and a man named Steve — had for months planned to break into the Demkos' home, steal everything, and take over their credit. Battle had been told the people in the house would be away on vacation. But he saw them at home when he walked by on the afternoon before the crimes, and so he assumed they'd be home during the burglary.

According to Battle, the group met up shortly after 4:00 a.m. the next day, and they arrived at the Demkos' home when it was still dark outside. Neal's brother entered the front door and Mr. Demko screamed. Steve struggled with and tried to choke Mr. Demko. Neal's brother tackled Mrs. Demko, who was saying she was unarmed and helpless. Battle described to officers that Mr. Demko was wearing a dark blue bathrobe and

light blue pajamas.  As he recounted, his job was to go to each room and take valuables, which he did.  While in the bedroom, he could hear Mrs. Demko saying, "don't hurt us, just take what you want . . . we don't have anything, but whatever you see just take and please, you know, don't hurt us."  When he left the bedroom, the couple was not in the house and he didn't see them being tied up.  But he heard them being tied up.  The group left the house in the Demkos' car as the sun was coming up.  Left Eye was driving.  Battle knew the Demkos were in the trunk because he heard pounding coming from there.  At some point, Battle became nauseated.  He asked that they stop the car, and upon getting out he started throwing up.  The others called him names and Left Eye tried to force him to get up, but he could not move.  The group left him on the side of the road.  Battle had an idea about what the group was going to do with the Demkos.  The group returned in less than an hour, at which point Battle started throwing up again.  The others once again ridiculed him and drove off without him.  Battle eventually returned home on his own.  Later that day, he saw Neal, who apologized for calling him names and offered him use of the Demkos' car, credit cards, and checks.  Neal told him that they "ain't around no more to report [the car] stolen so you can hold onto it for a while."  From this comment, Battle understood the couple was dead.  Around two nights later, he went back to the Demkos' home and took their TV, VCR, boom box, and speakers, and he then pawned the first three items.  When he went to the house, he took a FedEx notice off the front door.  Either on this trip to the house, or during another visit, he moved newspapers from the front of the house to the corner of the patio walkway.

Battle's story remained the same during his second interview, which lasted less than 25 minutes on the morning of

November 27. He told Detectives Gilliam and Pacifico further details about the locations of everyone in the group when they approached the Demkos' home and how he knew everyone in the group. And he identified photographs of some of the participants.

The detectives then took Battle to investigator Heard for a polygraph examination. The pretest interview for the examination, the examination itself, and the postexamination interview took between three and three and a half hours. All references to a polygraph examination were redacted at trial. The prosecution presented the November 27 pretest interview, polygraph examination, and postexamination interview by investigator Heard as simply another interrogation. During the pretest interview, Battle initially told investigator Heard a version of the crimes that was similar to what he had told Detectives Gilliam and Pacifico. He initially said he didn't know of the full extent of the burglary plan, including whether there was a plan to kill the Demkos. But he eventually admitted that he knew back in August that the plan was to kill the couple: Steve was to kill Mr. Demko, and Neal's brother was to kill Mrs. Demko. He maintained, however, that he got out of the car before Neal and the others drove the Demkos to the desert, that the Demkos were still alive when he got out of the car, and that he wasn't present at the murder scene.

Based on the pretest interview, investigator Heard then began the polygraph examination itself. He asked Battle various questions about the details of the crimes, including whether Battle was present when the Demkos were killed and whether Battle killed them himself. Battle denied both. When investigator Heard told Battle that, based on the polygraph test results, he knew Battle was lying about not being present at the

killings, Battle again changed his story. He admitted that he was present when the Demkos were killed, but that he was brought along at gunpoint and Steve killed the couple. Battle explained that he tried to get out of the car after the group left the Demkos' home, but that Steve pulled a gun on him and threatened to hurt his godson, Marquis. As the group got to the desert, Steve pulled Mrs. Demko from the trunk, and he and Neal's brother cut the zip ties off her ankles and wrists and then duct-taped her mouth, and also potentially her arms and legs. According to Battle, the group left Mrs. Demko with Steve while the rest of them drove further into the desert. He did not know how Mrs. Demko died, but he saw Steve running back toward their car with a bloody knife. He also couldn't say how exactly Mr. Demko died. But he last saw Mr. Demko with Steve, who still had the knife and had choked Mr. Demko while his ankles and wrists were bound with zip ties. Everyone eventually ran in different directions to throw the zip ties and duct tape around the desert. After the crimes, Washington apparently took some of the Demkos' credit cards and knew they were stolen.

Investigator Heard wasn't satisfied with Battle's account, and he accused Battle of having killed the Demkos himself. Battle then admitted to stabbing them. He said he took the zip ties off the Demkos and duct-taped them both. Steve choked Mr. Demko until he was unconscious or dead, and then handed Battle a knife. Steve held a gun to Battle's back and threatened to hurt Marquis, so Battle stabbed Mr. Demko on the left side of his neck. Steve and Neal's brother also forced Battle to stab Mrs. Demko in the back. Battle did not think he killed either victim, because he believed Mr. Demko was already dead when he stabbed him and Mrs. Demko was still alive after being stabbed.

During his final interview, an approximately four-hour interrogation that began almost immediately after the interview with investigator Heard ended, Battle first told Detectives Gilliam and Pacifico roughly the same version of events as he had earlier told investigator Heard. But the officers doubted aspects of his story. Detective Gilliam pointed out that it seemed odd that Battle ended up with most of the Demkos' property if, by his account, he was only a minor player in the five-person operation. He also told Battle that Left Eye could not have participated in the crimes because she had been arrested and jailed on the night of November 12, and he and Detective Pacifico questioned Battle about how only Battle's footprints were found at the scene of the murders; but neither of these statements were actually true.

Battle then changed his story once again. He claimed he never went out to the desert, and that he had lied to protect his friend, Washington. In this new version of events, he stated that he alone went to the Demkos' home after spontaneously deciding to burglarize it and pawn off some of their possessions. He explained that he had just been fired from his job and needed money for rent and other bills. He didn't think anyone would be at the home, and that if they were, they would be asleep. When he entered the home through the unlocked back door, he was surprised by Mr. Demko and got scared. So, he tied the couple up with a rope from the garage, fled the home without taking any property, and returned to the Christian Living Home, where he told Washington what had happened. Washington told Battle to take off his clothes, which he would destroy for him. Battle then showered; when he got back to his room, Washington was gone. But Washington returned later that morning. He told Battle that he had used zip ties and duct tape

11

to bind the Demkos, taken them to the desert, stabbed Mrs. Demko in the back and the neck, and choked and stabbed Mr. Demko in the neck. Washington had, among other things, the couple's driver's licenses, and he said their credit cards and checks were in their car. Washington said Battle could drive the car because the couple would not be found. Battle said he went back to the Demkos' house at some point for their TV and VCR, and on another occasion he drove to the desert area but turned back. He said he knew nearly all the details about the desert crime scene based on what Washington had told him.

The detectives doubted Battle's newest version of events. For example, they both pressed the fact that Battle knew too much about the murders not to have been present. At this point, Battle changed his story one final time. His final version of events diverged from his prior account at the point when he returned home and told Washington what had happened. He still claimed he initially went to the Demkos' house alone (though now he stated he had brought zip ties with him and used them to tie up the couple). But now Battle claimed that when he returned home, Washington brought Battle back to the Demko residence. The two men took the couple's TV and VCR, as well as other items. Washington then told Battle to help him pick up the couple, and Battle put Mrs. Demko into the trunk of the couple's car. When he asked Washington what they were doing, Washington pulled a gun on him and threatened to kill Battle's godson. Battle then put Mr. Demko in the trunk. Mrs. Demko asked if they were going to kill her, and Battle said they were not. Washington directed Battle to drive to the desert, and, once they arrived, he told Battle to get Mrs. Demko out of the trunk. Washington kept the gun on Battle and told him to kill the couple. At Washington's direction, Battle duct-taped Mrs.

Demko's mouth (though he did so loosely), her arms behind her back, and her feet. She said, "I thought you wasn't gonna kill us," and Battle started crying. Washington said, "come on T, your son's what, counting on you, don't fuck it up."

Battle stabbed Mrs. Demko in the back and the neck. When they drove away, she was still alive. Battle then exited the car again and got Mr. Demko out of the trunk. Washington told Battle, "just remember about your boy and worry about what I tell you to do now" and directed him to choke Mr. Demko. Battle did so, and then on Washington's orders, he stabbed Mr. Demko in the neck.

Despite all the variations and apparent lies in Battle's different accounts, the prosecution argued that the details he recounted across his custodial statements matched other evidence of how the crimes took place. According to the prosecution, Battle accurately described the location of the Demkos' home, details of its interior layout, and items that the Demkos possessed there. He also said that when he arrived at the home in the early morning, Mr. Demko was sitting at the kitchen table, which was consistent with Denise's description of her father's routine, and with the open newspaper, reading glasses, and coffee found at the kitchen table. He correctly noted Mr. Demko was hard of hearing. He admitted that he returned to the Demkos' home at least once and moved a FedEx slip from the front of their home, which was consistent with the slips found in a trash can in the home. And the prosecution argued that key details Battle gave about the killings matched evidence, including the autopsy and forensic reports, in at least five ways: As Battle described, Mr. Demko was wearing blue pajamas and a darker blue robe, and Mrs. Demko was also wearing pajamas and zebra-print slippers. His statements that

the Demkos were bound with zip ties and duct tape were consistent with the abrasions on their bodies and the evidence of both restraints found in the desert. His statements that the Demkos were wounded and shoved inside the trunk of their car were consistent with the blood found on the lid of the trunk. He accurately described multiple details about the route to the desert. And the autopsy findings on the Demkos' causes of death corroborated Battle's particular description of how Mr. Demko was strangled and stabbed with a knife.

In addition to the custodial statements, the prosecution presented testimony from witnesses that corroborated the statements and also linked Battle to the crimes.

Matthew Hunter, a friend of Battle's from the Christian Living Home, testified that sometime before November, Battle told him he was going to acquire a car and that the people "he got the car from . . . would come up missing" in the desert. Battle said he could bury a body in the desert, and nobody would ever find it.

According to Neal, whose real name was Anthony Bennett, Battle said he could get cars "real cheap."

McCune testified that Battle called her on the day of his arraignment, and she recounted their conversation. He told her that the crime was a robbery that went bad. He, Washington, and some other guys broke into a house, and when an old man appeared in the hallway, Battle got scared and turned to leave. But, as Battle told McCune, Washington pulled a gun on him and said, "We're not gonna get out of this now, they've seen us. We're parolees, we'll have to pay for this." Washington mentioned he was a three-striker. Washington said he would kill Battle's nieces and nephews (an apparent reference to

McCune's children) and hurt Marquis if Battle didn't do as he was told. Washington then had Battle tie up the elderly couple, put them in the trunk, and drive to the desert; Washington apparently sat behind Battle in the car and pointed a gun at Battle's head. Battle didn't tell McCune what happened to the people. And she didn't remember Battle specifically mentioning any particular people besides Washington being involved.

William Kryger technically shared a room with Battle at the Christian Living Home but didn't sleep in the room. Kryger testified that he saw Battle in the living room sometime around November 16 or 17, between 12:00 a.m. and 1:00 a.m. Battle was wearing a black sweatsuit and holding silver duct tape and zip ties. When Kryger asked Battle what he was doing, Battle responded, "Don't worry about it," and left. The next morning or the morning after that, Kryger saw Battle bringing cleaning supplies, video tapes, and a big TV into their bedroom. He assumed these items were being unloaded from a car Battle had recently acquired. Kryger's description of the car matched the Demkos' car. Kryger also testified he saw Washington removing items from the car, but he admitted that he previously had said Washington was at his girlfriend's home at the time.

The prosecution also introduced other testimony about physical evidence that tied Battle to the crimes. First, the day after Battle's arrest, detectives searched the room Battle shared with Kryger. They found, among other things, a Nordic Track box and accompanying VCR cassette in Mrs. Demko's name, and a Capital One credit card sheet, also in her name, hidden under Kryger's bed. They also found two stereo speakers with dimensions matching the indentations in the carpet of the Demkos' home. A few days later, detectives searched Washington's room at the Christian Living Home. They didn't

find any items obviously connected to the Demkos. But in the patio area outside of the home, they found a pillowcase containing the Demkos' checks, credit cards, and wallets. Additionally, officers recovered the Demkos' TV, VCR, and videos from Bear Valley Pawn. The pawn slips for the videos, dated November 15, and the TV and VCR, dated November 17, had Battle's name and fingerprints on them. McCune discovered additional evidence underneath her bathroom sink as she was packing to move: most critically, a calling card and gas cards, all with the name "Demko" on them.

Finally, anticipating Battle's third party culpability defense, the prosecution presented evidence that Washington was at work at the time Battle said the killings took place.

### 2. The Defense's Case

The defense argued that Perry Washington killed the Demkos, that Battle had no involvement in the murders, and that Battle became involved in this situation only because he took, used, and got rid of the Demkos' property after their deaths. Defense counsel argued that Battle made up the confessions to officers because Battle knew about the murders but was afraid of and wanted to protect Washington. Battle feared Washington would kill Marquis. The defense presented a range of evidence to support its theory.

On cross-examination during the prosecution's case-in-chief, the defense elicited testimony from Kryger about Washington's involvement in a residential burglary a little more than a week before the Demkos' murder. According to Kryger, he was with Washington when Washington took a man home from the hospital as part of an illegal taxi service, and then hid in the man's home and stole his property, including a TV and

VCR. Kryger picked up Washington after the burglary, and Washington brought the TV and VCR back home.

The defense also introduced evidence that Washington had a motive to kill the Demkos after burglarizing their home and committing robbery: He had prior convictions. The defense sought and was granted judicial notice of Washington's two prior felony convictions for robbery. A lawyer testified that, under California's "Three Strikes" law, Washington would have faced a sentence of 25 years to life in prison if caught and convicted of another felony for the burglary of the Demkos' home.

Moreover, the defense elicited testimony from Battle's friends and acquaintances that Battle had peculiar interactions with Washington around the time of the murders. On cross-examination, McCune testified that on the day of Battle's arrest, Washington appeared to have called Battle about 15 times. She said it seemed like Washington was directing Battle's behavior, and that Battle was afraid. Marquis's mother testified that whenever Battle was in the Demkos' car, Washington was also there. She also testified that Battle acted like a father to Marquis and would take any threat against him very seriously. The reverend who ran the Christian Living Home testified that Battle seemed withdrawn and preoccupied during the two weeks before being arrested. He also noticed two suspicious things relating to Washington during this time period. First, a couple of weeks before the arrest, he saw Washington and Battle together in the house. As he approached them, Washington intercepted him as Battle slipped by in the hallway; Battle then went into his bedroom, came out with a pillowcase, went outside through the back door, and then came back into the house. Second, at Thanksgiving dinner Washington came in, went over

17

to Battle and Hunter, had a conversation with them, and then all three men left.

The defense also presented evidence that Washington and others in his life had used some of the property stolen from the Demkos' home: namely, credit cards and a check. Washington was ultimately arrested for a parole violation, credit card fraud, theft, and embezzlement.

Furthermore, the defense called Johnney Prowse, who had been confined at the West Valley Detention Center with Washington. Prowse testified that sometime between late 2000 and April 2001, he overheard Washington tell two other inmates that he "got away with a couple of hot ones" for which "Battle Cat," as Battle was known, was being charged with. Prowse later met Battle in jail, asked him if he was "Battle Cat," and told him what he had heard. Prowse did not receive any benefit for his testimony in this case.

Finally, the defense challenged the adequacy of the investigation of the crimes. For example, police didn't interview Washington or search his room until multiple days after Battle made custodial statements implicating him; their questioning of Washington focused mainly on the stolen credit cards, and they did not investigate Battle's claims that Washington had entered the Demkos' house or driven their car; and they didn't attempt to match the latent prints developed in the case to Washington.[3]

---

[3] In addition to advancing its third party culpability argument, the defense challenged the strength of the evidence against Battle. For example, the defense pointed to inconsistencies between Battle's custodial statements and the

### 3. Rebuttal

The prosecution called five law enforcement officers, each of whom Prowse claimed he told about Washington's admissions. They testified Prowse never told them about an inmate having confessed to a crime for which someone else was being framed.

### B. Penalty Phase

### 1. The Prosecution's Case in Aggravation

The prosecution presented a stipulation that Battle had two prior felony convictions: one in 1995 for first degree residential burglary, and one in 1997 for forgery. The prosecution also presented evidence of two unadjudicated offenses. First, while serving time in 1999 for the forgery conviction, Battle participated in a prison riot. Battle admitted that he hit an inmate in self-defense, and because of his involvement he was temporarily placed in administrative segregation. Second, the prosecution called Matthew Hunter and Anthony Bennett, both of whom testified that Battle had attacked Hunter in the summer of 2000, when the three were living together in another Christian Living Home. Battle and Hunter went out drinking one night, and Battle became jealous when Hunter talked to a woman. Battle asked Hunter to go outside, and he then twice struck Hunter on the back of the head with a brandy bottle, knocking him to the ground and causing lacerations. According to Bennett, right after the assault Battle said he had beaten Hunter because Hunter had disrespected

---

physical evidence, including that Battle said he stabbed Mr. Demko on the left side of his neck, but the stab wound was actually on the right side.

him by "hitting on his girlfriend." Battle also said he tried to kill Hunter and he should have killed him, though Bennett admitted he had not mentioned these statements to the officers investigating the Demko murders. According to Hunter, Battle later explained that he had gotten drunk and "tripped out."

Finally, the prosecution presented victim impact evidence through the testimony of Denise Goodman and Richard Demko. The two testified about their father and stepmother, shedding light on their humble upbringings and wonderful marriage of 22 years. The two also testified about how difficult their parents' deaths and the trial had been on them. Denise described to the jury how she was a "daddy's girl," and had great memories of her father, including how he taught her to accomplish anything she could set her mind to. She recounted the horror of learning her father and stepmother were killed, having to identify them from a photograph, and having to learn at trial about the gruesome way they were killed. And she described how she felt following the murders: She became cynical and distrusting, scared of shadows, constantly locked doors behind her, and suffered nightmares. Richard described how his father had been his mentor and how his teenage daughter adored the Demkos. He said the murders took away his sense of security and made him afraid to let his daughter ride her bike out on her own. And he testified about how hard it was to learn at the trial that his parents had been put in the trunk of a car and taken out to the desert to be butchered.

### 2. The Defense's Case in Mitigation

The defense presented testimony from family members about Battle's background and upbringing, a psychologist about

the impact of Battle's childhood on his personality and behavior, and an expert regarding prison conditions.

The court heard testimony from Battle's biological father, three of his biological aunts, his biological grandmother, and two biological half sisters. Their testimony revealed how the extended family was plagued by poverty, violence, and racism, and that Battle experienced these issues during his early childhood. Battle's biological mother, a White woman, left his biological father, a Black man, when Battle was three months old. She eventually moved with Battle to West Virginia, where her parents lived. Her family was poor; sometimes they put coffee and water in Battle's baby bottle because they could not afford milk. At times, Battle was sent to live in a foster home. His foster family in West Virginia, a White family, made racial comments and spanked him with a wooden board. The town where he lived in West Virginia was also apparently racist, and because Battle was not White the community shunned the entire family. When the older children walked with Battle, people threw rocks and eggs at them. His grandmother made racist comments and refused to pick him up. One night, someone burned a cross in the yard, and Battle's mother suspected it might have been her own parents. Eventually, this all proved too much for her. Just before his fifth birthday, she gave him up to the Battles for a private adoption.

Battle's adoptive mother, Laura Battle, testified (in a videotaped deposition) about raising Battle with her husband. She testified that Battle had a normal childhood with no major psychological or behavioral problems. But she testified that he experienced "racial issues" as a child and was treated differently because of his race. She said he had a hard time adjusting to being the only minority child in karate class, which he did for 12

years; and at age 10, he asked what color he was after being teased at school because his complexion was lighter than some of the other (presumably Black or minority) children.

The psychologist testified that Battle's childhood marred him in ways that interfered with his ability to bond with others and develop a sense of interconnectedness. He described how Battle was, as a young child, an outsider in a deeply racist environment, and Battle would have appreciated that he was not accepted but was instead viewed as a problem. He also testified that Battle being abruptly abandoned by his mother was especially traumatic. He explained that her lack of a consistent presence early in Battle's life — including Battle's time in foster care — hampered Battle's ability to develop any "trust or predictability in the world," and that the "epitome" of this was when he was given up for adoption and taken away from everything and everyone he knew. He opined that even though Battle's adoptive mother testified that Battle had no problems after being adopted, internally, Battle would have had massive problems given the circumstances but simply learned not to show them. For example, in the sixth and seventh grades, Battle was sexually abused by a teacher. But Battle's adoptive mother got angry and didn't believe him; and even though the teacher was later arrested, the topic still was never discussed again. In the psychologist's view, Battle's childhood was not the reason why he was involved in the crimes in this case. But it put him at risk because he never had the opportunity to develop the ability, personality, and emotional stability to form relationships and a life that may have prevented this tragedy.

Finally, a former associate warden of San Quentin State Prison testified about conditions for prisoners serving life without parole.

## II.  *BATSON/WHEELER* MOTION

Battle is a Black male.  He contends the prosecutor violated his right to equal protection and to a jury drawn from a fair cross-section of the community by using a peremptory challenge on a Black prospective juror.  (*Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).)  The trial court denied Battle's *Batson/Wheeler* motion, finding he did not make a prima facie showing that the prosecutor exercised the single peremptory challenge at issue in a discriminatory manner.  We find no error.

### A. Background

The trial court began the jury selection process on February 10, 2003, when it swore in the first panel of prospective jurors and began to address hardship excusals.  After the initial hardship excusals, 187 prospective jurors remained.  The court had these prospective jurors fill out a 20-page questionnaire.  It requested that the parties compile a list of prospective jurors for which, based on their questionnaire answers, excusals for cause would be stipulated to prior to voir dire.  The parties agreed to stipulate to 71 prospective jurors.  The prosecutor stated he and defense counsel agreed to "pretty much eliminate[] everybody that said they were A and E [in response to question 2A on page 15 of the questionnaire]."[4]

On March 4, the trial court excused additional prospective jurors for hardship, leaving 88 prospective jurors.  Seven (8

---

[4]  Question 2A asked prospective jurors to "check the one that best describes your feelings or attitude: [¶] A. I strongly favor the death penalty. . . . [¶] B. I favor the death penalty . . . . [¶] C. I neither favor nor oppose the death penalty. . . . [¶] D. I have some doubts or reservations about the death penalty . . . .

percent) were Black. The voir dire process then proceeded under a " 'jury box' method." (*People v. Avila* (2006) 38 Cal.4th 491, 537 (*Avila*).) The court called 12 prospective jurors into the box for questioning by the attorneys. After questioning the jurors, the attorneys could make for-cause challenges. The attorneys could also use alternating peremptory challenges or accept the jury as constituted. When the court excused a prospective juror, it called a new prospective juror into the box for questioning.

Two of the 12 prospective jurors first seated in the box, S.W. and E.F., were Black. The prosecutor used his fifth peremptory challenge to excuse S.W. after moving unsuccessfully to challenge her for cause.[5] After defense counsel exercised his next peremptory challenge, the court called J.B., a Black woman, into the box. The prosecutor questioned J.B. at length about her death penalty views but passed for cause. Upon the resumption of voir dire the following day, the court excused two Black jurors seated in the jury box: The court excused J.K. on its own finding of hardship. And it excused M.N., who had mixed up her dates and therefore was not present on the previous day, for cause (by stipulation of the parties).

Soon thereafter, the prosecutor used his ninth peremptory challenge to excuse J.B. The prosecution exercised two

---

[¶] E. I strongly oppose the death penalty. . . ." (Underscoring omitted.)

[5]     The record does not indicate that the trial court expressly denied the for-cause challenge. That seems quite irregular. But defense counsel did not raise this issue or specifically object to the excusal of S.W., and on appeal Battle does not base his *Batson/Wheeler* claim on S.W.'s dismissal.

additional peremptory challenges, and defense counsel then raised a *Batson*/*Wheeler* motion. He asserted that he was concerned about the prosecutor's use of peremptory challenges against Black prospective jurors, "most specifically" J.B. He first observed that the prosecutor had struck two of the three Black prospective jurors that had entered the box. He argued this figure was "glaring," even though the number of strikes "may not seem like a large number" because of the small number of Black individuals in the venire. He also pointed out that the prosecutor had used two of his 11 peremptory challenges (18 percent) on Black prospective jurors, even though they comprised only 8.13 percent of the prospective jurors overall. Defense counsel did not object to S.W.'s removal, and S.W.'s removal is not at issue on appeal. What's at issue here is, ultimately, the removal of *one* juror out of the prosecutor's first 11 peremptory challenges (9.09 percent). Counsel appears to have calculated the representation of Black prospective jurors by dividing the number of those jurors present on the first day of voir dire (7) by the number of prospective jurors present on that day, excluding two excused by the court at the outset (86).

Defense counsel argued that striking J.B. was "especially concern[ing]," because J.B. had indicated during questioning that she could be fair. Furthermore, he contended that the prosecutor's questioning of J.B. lasted longer than the prosecutor's questioning of other jurors, even after J.B. said she could be fair and could impose the death penalty. He also explained that the prosecutor had asked to stipulate to J.B.'s dismissal in the initial list of proposed stipulations, but that there was no basis in her questionnaire responses to justify such a stipulation. Defense counsel then asserted that the prosecutor had proposed to stipulate the dismissal of other Black

prospective jurors without justification. As an example, he noted that the prosecution had proposed to stipulate to A.H., even though her questionnaire was "completely unbiased. She said she could be completely fair, she neither favored nor opposed the death penalty, and yet [the prosecutor] put [A.H.] on his list of stipulations." Defense counsel concluded by urging the court to find he had established a prima facie case of racial discrimination, noting that there were very few Black prospective jurors and that Battle was Black.

The trial court found that Battle failed to establish a prima facie case. The court believed that it had to "make a finding that there has been a systematic exclusion of a protect[ed] class" and explained it was "not in a position to say [the prosecutor] . . . has a racially motivated motive." It further explained that the proposed stipulations indicated the prosecutor thought the identified jurors weren't qualified for a capital case, and that it "didn't know at this juncture that the reason for [any of the proposed stipulations] was racially motivated. Absent that . . . [the court] can't find, and [it] won't find, that there is a prima facie showing at this point." The court indicated that if defense counsel could show that "the only ones [the prosecutor] wanted excluded by stipulation were minorities" then "maybe" there is "something to talk about." The trial court told defense counsel "You're close" and denied the *Batson*/*Wheeler* motion.

The court asked the prosecutor if he would like to say anything for the record. The prosecutor said, "I don't feel I need to justify my reasons," but he noted that a different Black prospective juror he had proposed for stipulated dismissal, M.N., had expressed clear death penalty reservations. The court added that M.N.'s son had been murdered, and it was surprised

she had not been stipulated to. The prosecutor agreed, stating, "[T]hat's one of the people I proposed to stipulate to. And that goes far beyond racial reasons."

Before the regular jury was sworn, the prosecution struck eight additional prospective jurors. None was Black. Nonetheless, none of the remaining Black prospective jurors made it onto the regular jury. E.F. remained in the box for several rounds — and the prosecution twice accepted panels including him — but defense counsel eventually struck him. During alternate juror selection, the court excused A.H. and B.A., two Black prospective jurors, by stipulation of the parties. The final Black prospective juror, Juror No. 360, was selected as an alternate, after the prosecutor passed him for cause and the parties accepted a panel of four alternates that included him.

The resulting regular jury was comprised of 12 White jurors. Although one alternate juror ended up being selected as a replacement during the penalty phase, and a second alternate was selected when the first alternate also had to be excused, Juror No. 360 was not selected. The selected alternates were White, so the jury that sentenced Battle to death was also all White.

## B. Analysis

Both the United States and California Constitutions prohibit the exercise of peremptory strikes on the basis of race or ethnicity. (*Batson, supra,* 476 U.S. at p. 89; *Wheeler, supra,* 22 Cal.3d at pp. 276–277.) We follow a familiar three-step process in evaluating a defendant's *Batson/Wheeler* motion. First, the defendant must make a prima facie case by showing facts sufficient to support an inference of discriminatory purpose. (*Johnson v. California* (2005) 545 U.S. 162, 168

(*Johnson*).)   Second, if the defendant makes a prima facie showing, the burden shifts to the prosecutor to offer a permissible, nondiscriminatory explanation for the strike. (*Ibid*.)   Third, if the prosecutor offers a nondiscriminatory explanation, the trial court must decide whether that explanation is genuine, or whether impermissible discrimination in fact motivated the strike.  (*Ibid*.)

The trial court denied Battle's *Batson*/*Wheeler* motion at the first step.  Ordinarily, we review such a denial deferentially, considering only whether substantial evidence supports the trial court's conclusion.  (*People v. Bonilla* (2007) 41 Cal.4th 313, 341 (*Bonilla*).)  But Battle's trial occurred before the United States Supreme Court announced in *Johnson, supra*, 545 U.S. at page 168, that *Batson*'s step one requires only a reasonable inference of discrimination, as opposed to the " 'strong likelihood' " standard that California courts had been applying at the time. (*People v. Clark* (2016) 63 Cal.4th 522, 566 (*Clark*).)  Because Battle's trial predated *Johnson* and we cannot be sure from the record that the trial court applied the appropriate standard, we conduct our own independent review:  We apply the *Johnson* standard de novo to determine whether the record supports an inference that the prosecutor excused a juror on an impermissible basis. (*Bonilla, supra,* 41 Cal.4th at p. 342.)

In conducting our review, we remain mindful of the "low threshold" showing required for *Batson*'s first step.  (*People v. Scott* (2015) 61 Cal.4th 363, 384 (*Scott*).)  This step should not "be so onerous that a defendant would have to persuade the judge—on the basis of all the facts, some of which are impossible for the defendant to know with certainty—that the challenge was more likely than not the product of purposeful discrimination."  (*Johnson, supra,* 545 U.S. at p. 170.)   It is

satisfied simply by evidence sufficient to permit us to draw an inference that discrimination *may* have occurred. (See *id.* at pp. 168, 171–172.)

Battle argues that racial discrimination motivated the prosecutor's peremptory strike of J.B. He explicitly indicates that his *Batson*/*Wheeler* argument does not concern S.W., the other Black prospective juror struck by the prosecution. Our inquiry therefore focuses on J.B.'s excusal.

We consider whether " 'the totality of relevant facts' " surrounding J.B.'s excusal " 'gives rise to an inference of discriminatory purpose.' " (*Johnson*, *supra*, 545 U.S. at p. 168.) This does not — contrary to the trial court's assertion — require that Battle show a "systematic exclusion of a protect[ed] class."[6] The ultimate issue is not whether there is a pattern of systematic exclusion, but instead " ' "whether a particular prospective juror has been challenged because of group bias." ' " (*Clark*, *supra*, 63 Cal.4th at p. 567.)

We examine the entire record before the trial court to determine whether it supports an inference of such group bias. (*People v. Reed* (2018) 4 Cal.5th 989, 999 (*Reed*).) Certain types of evidence are especially relevant to this inquiry, including whether the prosecutor has struck most or all of the members of the venire from an identified group, whether a party has used a disproportionate number of strikes against members of that

---

[6] Battle argues that the trial court's misstatement, and the pre-*Johnson* case law that governed his trial, indicates we must remand. But he fails to explain why we can't, as our precedent instructs, conduct a de novo review under these circumstances. (See, e.g., *Avila*, *supra*, 38 Cal.4th at pp. 553–554.)

group, whether the party has engaged prospective jurors of that group in only desultory voir dire, whether the defendant is a member of that group, and whether the victim is a member of the group in which the majority of the remaining jurors belong. (*Scott*, *supra*, 61 Cal.4th at p. 384.)  We may also consider nondiscriminatory reasons for the challenged strikes that are "apparent from and 'clearly established' in the record."  (*Ibid.*)  Yet we may do so only when these reasons "necessarily dispel any inference of bias," such that " 'there is no longer any suspicion . . . of discrimination in those strikes.' "  (*Ibid.*)

Engaging as we must in an independent review of this record, we first note that the presence of salient racial issues in the case raises concerns that warrant careful consideration.

To begin with, Battle is Black, and his victims were White. This provided the prosecutor with a plausible motive to strike Black prospective jurors on the impermissible "assumption or belief that" they "would favor" Battle solely because of their shared race. (*Flowers v. Mississippi* (2019) ___ U.S. ___, ___ [139 S.Ct. 2228, 2241].)  As a result, the racial identities at play " 'raise[] heightened concerns about whether the prosecutor's challenge' " of J.B. was " 'racially motivated.' "  (*People v. Rhoades* (2019) 8 Cal.5th 393, 430 (*Rhoades*); see *Powers v. Ohio* (1991) 499 U.S. 400, 416 (*Powers*).)

Also raising heightened concerns is the fact that Battle was ultimately convicted and sentenced to death for killing White victims by an all-White jury.  (*Rhoades*, *supra*, 8 Cal.5th at p. 430 [racial identity between the victim and the majority of remaining jurors raises heightened concerns]; see *Wheeler*, *supra*, 22 Cal.3d at p. 281.)  Of course, the ultimate composition of the jury serves as standalone evidence to inform our step-one

analysis. (See, e.g., *Bonilla*, *supra*, 41 Cal.4th at p. 346.) But it's particularly germane where the case was racially charged. (*Rhoades*, *supra*, 8 Cal.5th at p. 435.) Here, Battle broke into an elderly White couple's home, forced them into the trunk of their own car, drove them out into the desert, and strangled the man and stabbed both victims to death. Moreover, part of the defense's mitigation case involved evidence that Battle had been the victim of racial discrimination during his childhood. Given this racially fraught context, that the prosecutor's strikes led in large part to an all-White regular jury is "obviously highly relevant to whether a prima facie case existed." (*People v. Johnson* (2003) 30 Cal.4th 1302, 1326; cf. *People v. Hardy* (2018) 5 Cal.5th 56, 78 (*Hardy*) [similar principle at step three].)[7]

Together, the salient racial issues at play are significant — a Black defendant, the excusal of Black prospective jurors, White victims of violent interracial crimes, and a conviction and sentence imposed by an all-White jury. As Battle argues, these are important factors when determining whether J.B.'s excusal may have occurred because of discrimination in the jury selection process. (See *Powers*, *supra*, 499 U.S. at p. 416.) And they distinguish this case from our recent decisions in *Rhoades*, *supra*, 8 Cal.5th at pages 435–436, and *Reed, supra*, 4 Cal.5th at pages 998–1003. But standing alone, these factors are not dispositive. (See, e.g., *Hardy*, *supra*, 5 Cal.5th at p. 78.) Rather, we must carefully scrutinize the

[7] Battle also argues the trial involved a key cross-racial credibility issue: The all-White jury had to assess the credibility of his confessions to officers, which the defense asserted were fabricated. But the record does not reveal the officers' races. (Cf. *U.S. v. Stephens* (7th Cir. 2005) 421 F.3d 503, 515; *Holloway v. Horn* (3d Cir. 2004) 355 F.3d 707, 723.)

remaining evidence "with these and all other relevant circumstances in mind." (*Ibid.*; see *ibid.* [racial overtones and prosecutor's excusal of all Black jurors were "troubling" circumstances "warrant[ing] close scrutiny"]; *Smith v. U.S.* (D.C. 2009) 966 A.2d 367, 377 [similar]; *People v. Johnson*, *supra*, 30 Cal.4th at p. 1326 [similar].)

Scrutinizing the record through this lens, we conclude that Battle's showing doesn't suffice to give rise to an inference that discriminatory intent motivated J.B.'s excusal.

Battle contends that the prosecutor's disproportionate strike rate against Black prospective jurors supports a prima facie case. (See *People v. Bell* (2007) 40 Cal.4th 582, 598, fn. 4 (*Bell*).) We disagree. At the time of the *Batson/Wheeler* motion, the prosecutor had used approximately 18 percent (2/11) of his strikes to remove Black prospective jurors; at the close of voir dire, he had used over 10 percent (2/19) of his strikes against such jurors. Although these figures exceed 8 percent (7/88) — the proportion of Black prospective jurors in the pool of jurors subject to peremptory challenge — we can glean only limited insight from the discrepancies. The small sample size introduces uncertainty into the analysis and severely limits the value of the data. (See, e.g., *People v. Parker* (2017) 2 Cal.5th 1184, 1212, fn. 12.) For example, if the prosecution had succeeded in removing S.W. for cause and therefore used just one strike against a Black prospective juror, both strike rate disparities become negligible. (Cf. *People v. Banks* (2014) 59 Cal.4th 1113, 1147 (*Banks*); *People v. Jones* (2011) 51 Cal.4th

346, 362 (*Jones*).)[8]  That is essentialy the situation in this case, since Battle challenges only J.B.'s excusal.

Battle acknowledges these sample size concerns, and he offers three reasons why these concerns should not be dispositive.  Each is minimally persuasive.

Battle first argues that we should draw insight from the trial court's comment that the *Batson/Wheeler* motion was a "close" call.  But it's not clear that Battle is right in his description of the trial court's comment.  The trial court said, "You're close."  We cannot resolve whether the trial court meant that its *ruling* had been close (*Johnson*, *supra*, 545 U.S. at p. 173), or that the defense might be able to point to additional developments, regarding future strikes, that would shift the scales in its favor (see *Rhoades*, *supra*, 8 Cal.5th at p. 437).  In any event, even if we accept Battle's interpretation, we find it difficult to square with his earlier concession — made in his initial explanation for why we must remand the case — that our precedent "provides no indication" that the strike rate statistics made this a close case.  We agree with his assessment on our de novo review.  (See *Rhoades*, *supra*, at p. 437 [on de novo review, we don't have to parse trial court's "commentary" on "suspicious[ness]" of "prior strikes"]; but see *id.* at p. 461 (dis.

---

[8]  Under this scenario, the prosecutor would have used 9 percent (1/11) of his strikes to remove Black prospective jurors by the time of the *Batson/Wheeler* motion, and 5 percent (1/19) of all his strikes against such jurors.  The former barely exceeds Black representation in the pool of jurors subject to challenge (8 percent), and the latter is less than this figure *and* Black representation on the regular/alternate jury (6 percent (1/16)).

opn. of Liu, J.) [such commentary, even if not binding on us, can have relevance in our (totality-of-the-circumstances) analysis].)

Battle also contends that the high exclusion rate of Black prospective jurors — e.g., the prosecutor struck two of the first three Black prospective jurors to enter the jury box — suggests we should draw an inference of discrimination from the small sample size of strikes. But Battle admits that this argument can't easily be reconciled with our precedent. As we have frequently stated: "Although circumstances may be imagined in which a prima facie case could be shown on the basis of a single excusal, in the ordinary case . . . to make a prima facie case after the excusal of only one or two members of a group is very difficult." (*Bell, supra,* 40 Cal.4th at p. 598, fn. 3.)[9]

Battle's final sample-size argument also fails to persuade. Battle argues that the prosecutor disproportionately struck not just Black prospective jurors, but also Hispanic prospective jurors. Battle did not make this argument at the trial court; the prosecutor was not given an opportunity to address it, nor was

---

[9] To the extent Battle asks us to overturn this precedent — including because of the recent passage of Assembly Bill No. 3070 (2019–2020 Reg. Sess.) — we decline the invitation. Assembly Bill No. 3070 has not yet taken effect (Code of Civ. Proc., § 231.7, subd. (i)), so it offers us no occasion to revisit *Bell,* or other aspects of our *Batson/Wheeler* jurisprudence more broadly. We note, however, that a small sample size is not automatically a death knell for an argument of a prima facie case at step one. (See, e.g., *Johnson, supra,* 545 U.S. at p. 164 [prima facie showing where all three Black prospective jurors struck].)

the court called upon to rule on the question. Even if we decided such an analysis was relevant in these circumstances, Battle marshals nothing from the record to permit us to sufficiently evaluate the propriety of the other excusals. Without additional indicia of discriminatory purpose — showing the prosecutor improperly targeted these jurors to achieve an all-White jury — we cannot conclude that the bare statistics Battle identifies establish any inference that racial bias motivated J.B.'s excusal. (Cf. *People v. Johnson* (2018) 8 Cal.5th 475, 509 & fn. 9.)

Nor is Battle's argument bolstered by other evidence of the prosecution's conduct of jury selection. To begin with, the prosecutor did not strike J.B. right away, but instead passed on her for several rounds before striking her using his ninth challenge. This fact tends to suggest that J.B.'s later challenge was not based on race. (See, e.g., *People v. Clark* (2011) 52 Cal.4th 856, 906.) Of course, "the prosecutor's passes" do not "themselves wholly preclude a finding that a panelist is struck on account of bias . . . ." (*People v. Gutierrez* (2017) 2 Cal.5th 1150, 1170–1171.) A delay in striking these jurors could also align with a strategy to avoid detection of race-conscious strikes. (See *People v. Motton* (1985) 39 Cal.3d 596, 607–608 (*Motton*).) Yet Battle offers nothing to indicate such a strategy existed here.

Moreover, the prosecutor repeatedly passed on E.F., a Black prospective juror who was in the jury box from the very beginning. In fact, the prosecutor twice accepted a jury panel containing E.F. before defense counsel eventually struck him. This fact tends to suggest that race was not a motive behind J.B.'s challenge. (See *People v. Streeter* (2012) 54 Cal.4th 205, 225.) True: In many cases where we apply this principle, some or all of the passed Black jurors went on to actually serve on the

juries, unlike here. (*People v. Clark*, *supra*, 52 Cal.4th at p. 906; *People v. Blacksher* (2011) 52 Cal.4th 769, 802.) It's also true that we can't blindly apply this principle, without any consideration of " 'the practical realities of jury selection.' " (*Motton*, *supra*, 39 Cal.3d at p. 607.) Battle points to two factors: (1) undesirable jurors remained on the panels the prosecution accepted; and (2) the prosecutor's acceptances occurred after the court, in ruling on the *Batson/Wheeler* motion, said "[y]ou're close." Yet nothing about these factors indicates that the prosecutor was exercising peremptory challenges based on race, as opposed to an individualized analysis of each juror. Battle ignores the reality that the defense struck E.F., and that by all indications E.F. was a potentially favorable juror to the prosecution. (Cf. *People v. Lenix* (2008) 44 Cal.4th 602, 610, 629.)

The prosecutor's acceptance of a jury with a Black prospective juror (Juror No. 360) as an alternate, and this juror ultimately being seated as an alternate, further lessens any inference of discrimination. We have often underscored that "ultimate inclusion on the jury of members of the group allegedly targeted by discrimination indicates ' "good faith " ' in the use of peremptory challenges, and may show under all the circumstances that no *Wheeler/Batson* violation occurred." (*People v. Garcia* (2011) 52 Cal.4th 706, 747–748; see also *Reed*, *supra*, 4 Cal.5th at p. 1000.) Our cases have applied this principle when some or all the Black jurors in question were, as in this case, seated as alternates, instead of on the 12-member jury. (See, e.g., *Jones*, *supra*, 51 Cal.4th at p. 363; *People v. Kelly* (2007) 42 Cal.4th 763, 780 (*Kelly*).) We do so here as well. We are mindful, though, of Battle's observation that parties' strategies for selecting alternates can be markedly different

from their strategies for selecting the actual jury. (See *People v. Lewis* (2006) 39 Cal.4th 970, 1018, fn. 13.)

It is against this backdrop that we consider the circumstances relevant to the strike of J.B. Although Battle argued in the trial court that the strike of J.B. was "concerning" because J.B. indicated during questioning that she could be fair, the Attorney General identifies a race-neutral reason for J.B.'s excusal that was "apparent from and 'clearly established' in the record." (*Scott*, *supra*, 61 Cal.4th at p. 384; see *Rhoades*, *supra*, 8 Cal.5th at pp. 430–431.) Considering both positions, we agree with the Attorney General that the record "dispel[s] any inference of bias" that might be thought to arise from the strike of this particular juror. (*Scott*, at p. 384.)[10] The remainder of Battle's argument, by contrast, fails to cast any doubt on the prosecutor's motives for striking J.B. We turn first to what the record reveals about the race-neutral basis justifying J.B.'s strike.

J.B. was a 52-year-old Black woman. She was married with two sons, had a master's degree in school administration and school psychology, and had been an elementary school

---

[10] As noted, Battle does not challenge S.W.'s excusal. During voir dire, S.W. expressed serious concerns about her ability to vote for the death penalty, and she ultimately stated that she didn't think she could impose the death penalty for any reason. Therefore, even if Battle had raised a *Batson/Wheeler* claim regarding her excusal, her strong reservations dispel any inference of discrimination (see, e.g., *Scott*, *supra*, 61 Cal.4th at p. 385), and the trial court could justifiably have even excused S.W. for cause (see *Wainwright v. Witt* (1985) 469 U.S. 412, 424).

teacher since 1974. She had previously served on a jury, which reached a verdict. And she had two arguably pro-prosecution attributes: She herself had been the victim of a violent robbery in her home, and one of her sisters had previously been in local law enforcement. (*People v. Turner* (1986) 42 Cal.3d 711, 719.) During voir dire, she even stated that she assumed the prosecutor had a compelling case, saying the case "must be pretty strong. We're all sitting here." By all accounts, J.B. also generally appeared to be an impartial prospective juror on issues pertaining to guilt. In her questionnaire, she answered that Battle's race would not impact her evaluation of the evidence in the case. She stated that she had no sentiments on racial issues, that she didn't judge anyone based on race, and that her concern was only that the defendant be given a fair trial. She stated, "I believe in the <u>system</u>: court/criminal system." And throughout her questionnaire and voir dire, she emphasized she intended to listen to all the facts, and that her judgment would be based on the evidence.

J.B. also appeared at first blush to be unbiased in her views on the death penalty. J.B. explained during voir dire that she could consider both the death penalty and a life sentence. She stated she wouldn't have a problem voting for death "as long as all the facts were proven." After J.B. explained she expected expert witnesses to be well-prepared, given someone's life was on the line, the prosecutor asked if she could impose the death penalty in light of this concern. She responded: "I could if he's guilty." The prosecutor also asked if J.B. would be able to look at the defendant and tell him death is the appropriate sentence. She said, "I don't have a problem with that. I'm my own person. I don't let anyone sway me right or left. I have to go by what I feel." J.B.'s questionnaire responses are largely in line with

these statements. She indicated she neither favored nor opposed the death penalty and would consider both possible penalties, and that she had no moral, philosophical, or religious objections to the death penalty. She thought Texas used the death penalty too frequently, but California used it "about right." And she indicated she would consider all mitigating and aggravating circumstances in reaching a penalty determination.

But just because the record reveals that J.B. had much to commend her (dis. opn., *post*, at pp. 2–3, 5) doesn't mean Battle has made a prima facie case. So long as prosecutors are not motivated by discriminatory intent, they can strike prospective jurors for any reason — including for reasons that don't necessarily justify a challenge for cause. (*Rhoades*, *supra*, 8 Cal.5th at p. 435.) They don't have to accept a prospective juror simply because the juror may be pro-prosecution in some respects. (See, e.g., *People v. Miles* (2020) 9 Cal.5th 513, 562; *People v. Thomas* (2012) 53 Cal.4th 771, 794.) That defense counsel saw no reason for the prosecutor to challenge J.B. "does not raise an inference that the prosecutor's reason for doing so was improper group bias." (*Clark*, *supra*, 63 Cal.4th at p. 567.) And most importantly, even when a prospective juror has expressed neutrality or a favorable opinion on the death penalty, the prosecutor is not required to take that juror's answers " ' "at face value" ' " when " 'other statements or attitudes of the juror suggest that the juror has "reservations or scruples" about imposing the death penalty . . . .' " (*Banks, supra*, 59 Cal.4th at p. 1149; see *People v. Zaragoza* (2016) 1 Cal.5th 21, 44.) Such statements or attitudes are race-neutral reasons that can justify a peremptory strike. (*Rhoades*, *supra*, 8 Cal.5th at pp. 431–432; *Scott*, *supra*, 61 Cal.4th at p. 385.)

What the record reveals here are assertions by J.B. that, considered together and in context, justifiably would have raised significant concerns about her *willingness* to impose the death penalty.

In response to the jury questionnaire's prompt asking what a sentence of "death by lethal injection or death in the gas chamber" would "mean to you," she answered: "Curel [*sic*]. Inhumane. Why?" This strongly worded answer suggests she had general misgivings about the death penalty, even in spite of her other answers.

During voir dire, the prosecutor followed up on the misgivings J.B. expressed in her questionnaire answer. J.B. responded, "I feel that way when I've read articles about — I would say, for instance, the inmates in Texas. And a lot of them have been proven innocent based on the DNA and then they were given the death penalty. I feel that part was — I didn't like that part because they were found guilty, they went — you know, they were facing death and 20 years later they found out they didn't do it. And I just felt that that was so inhumane to execute someone for something that they didn't do." The prosecutor then asked if the innocent Texans would be on her mind if the case reached the penalty phase or if — to avoid condemning an innocent person — she'd consider voting for life to make it easier. J.B. responded "No." Although her responses may have helped contextualize her questionnaire answer, they would not have fully dispelled legitimate concerns regarding her death penalty views. "Cruel" and "inhumane" are powerful words — suggesting J.B. had concerns about whether the death penalty should be imposed *at all*, and her clarification did not entirely get at these concerns. She prefaced her clarification with "for instance," signaling she may have had more than one

reason for her concerns. And her reference to Texas cases introduced a new dimension to her misgivings: By explaining that "a lot of" inmates in Texas "have been proven innocent" and that someone could be sentenced to death and then "20 years later" be proven innocent, J.B. clearly conveyed that she worried about being involved in a capital trial involving an innocent defendant. Though J.B. denied she had this concern here, no reasonable prosecutor would have taken her denial at face value given her ensuing response.

In her ensuing response, J.B. explained: "Because I have to live with myself, and I go with my first feeling and I go with basically facts. And if — *it's unfortunate that if it's proven that he's guilty I have to go along with the law.* There's — I can't go by, [t]his is what [J.B.] feels. I have to go by, [t]his is the law, this is what he did, this is what was proven. And without a reasonable doubt, I have to. I have to vote on it." (Italics added.) This response, taken together with her "cruel" and "inhumane" questionnaire answer and her insufficient clarification referencing Texas cases, indicates that J.B.'s death penalty reservations were serious. Particularly in light of her other answers expressing reservations, saying it was "unfortunate" that she had "to go along with the law" would reasonably have conveyed that she had an inherent discomfort with the death penalty — i.e., she generally thought it was a verdict to avoid, despite being required to consider it and be able to render it when appropriate. In other words, she viewed it as "unfortunate" that she could be in the position of serving as a capital juror and potentially imposing the death penalty. Even though this view may not have justified J.B.'s excusal for cause, we focus our inquiry on the reasons that readily appear for the prosecution's exercise of a discretionary strike. (See *Rhoades,*

*supra*, 8 Cal.5th at p. 435 [" 'Unlike a for-cause challenge . . . , the issue here is not whether a juror held views that would impair his or her ability to follow the law. Unimpaired jurors may still be the subject of valid peremptory strikes,' " so long as the strikes have not been undertaken for a discriminatory purpose].) Any reasonable prosecutor would logically wish to avoid a juror who, over the course of multiple responses, expressed such hesitation to impose the death penalty. (See, e.g., *Rhoades*, *supra*, 8 Cal.5th at pp. 431–432.)

Battle's argument regarding the "unfortunate" voir dire response does not persuade. He contends that all J.B. was saying was it would be "unfortunate" *for Battle* — not herself — that she may have to vote for his death. Battle's interpretation rests on a strained reading of the colloquy, in which the prosecutor clearly asks J.B. to express views about how *she* felt about serving on a capital jury and potentially voting for a death sentence. ("Is that something that's going to be on *your* mind, what happened in Texas, that's going to cause *you* or give *you* some concern if *you* reach the penalty phase in this case where *you* say, Well, *I* know about perhaps there have been some innocent people that have been put on death row. *I* don't want to make that mistake; *I'm* not going to vote for death. It's just easier. *I* will give him life without parole?") (Italics added.)

We acknowledge that some of J.B.'s statements regarding her willingness to impose the death penalty can certainly be individually dissected and shown to have some ambiguity when considered in isolation. For instance, J.B. did provide *some* helpful clarity to her troubling questionnaire answer. (See dis. opn., *post*, at pp. 3–4.) Moreover, her "unfortunate" comment can, in some sense, naturally be understood as her candidly acknowledging the serious responsibility and practical realities

involved in serving on a capital jury and choosing between life without parole and a death verdict. (Cf. *People v. Fudge* (1994) 7 Cal.4th 1075, 1094 [a juror's equivocation on the death penalty is understandable given the "stress and anxiety" of serving on a jury].) Similarly, as the dissent observes, one could potentially understand J.B.'s "unfortunate" comment as indicating "she thought the task of deciding whether a person should live or die is more difficult than simply voting for life imprisonment without parole." (Dis. opn., *post*, at p. 5.) And J.B. did give other answers indicating she *could* vote for the death penalty.

But here, even if we could accept alternative interpretations of J.B.'s "unfortunate" comment, or of any of the other individual comments we have identified, considered in isolation, those alternative interpretations would not alter our conclusion. The prosecutor certainly was not obligated to interpret each of J.B.'s responses in the light most favorable to Battle. (See *People v. Panah* (2005) 35 Cal.4th 395, 441.) And here, taken together and considered in context, the *combination* of J.B.'s responses revealed significant reservations about the death penalty. J.B.'s misgivings may not have justified excusing her for cause, but they nonetheless establish a reason why the prosecution would not have wanted her on the jury, separate and apart from her race. (See *Rhoades*, *supra*, 8 Cal.5th at p. 431 [noting that unwillingness to impose the death penalty is a characteristic any reasonable prosecutor would "logically avoid" in a death penalty case]; cf. *Reed*, *supra*, 4 Cal.5th at p. 1002 ["[T]he declaration of opposition to the death penalty, even when combined with some subsequent equivocation, reasonably dispels any inference of discrimination"]; *Panah*, *supra*, 35 Cal.4th at p. 441 [even if reservations insufficient for for-cause excusal, they justified a peremptory challenge].) The colloquy

thus dispels whatever inference of discrimination might otherwise be thought to arise from the sole challenged strike in this case.

Nothing in Battle's showing calls into question our conclusion that J.B.'s death penalty misgivings, under the circumstances, necessarily dispel any inference that discrimination motivated her excusal.

First, Battle does not offer any comparative juror analysis relevant to J.B.'s misgivings. Although such analysis is not required at the prima facie stage, we have explained that it can sometimes "aid in determining whether the reasons we are able to identify on the record are ones that help to dispel any inference that the prosecution exercised its strikes in a biased manner." (*Rhoades, supra*, 8 Cal.5th at p. 432, fn. 17; see *Reed, supra*, 4 Cal.5th at p. 1002 [comparing struck jurors and seated jurors to assess the argument that race-neutral "rationales could not have motivated the prosecutor's strikes"].)

The strike circumstances that Battle does identify fail, like his initial statistical arguments, to offer us any insight. Each lacks record support.

Most prominently, Battle argues the prosecutor used stipulations for cause prior to voir dire to strategically eliminate Black prospective jurors. As proof, he calculates that Black (and Hispanic) prospective jurors were stipulated to for cause at a disproportionate rate compared to their representation in the jury pool, even though they weren't any more likely than their White counterparts to have disqualifying death penalty questionnaire answers. Specious for-cause challenges "might in some circumstances support an inference of bias." (*People v. Sánchez* (2016) 63 Cal.4th 411, 437 (*Sánchez*); see *Crittenden v.*

*Ayers* (9th Cir. 2010) 624 F.3d 943, 956–957.) But Battle's argument falls well short of this standard: He *agreed* to the pre-voir dire excusals by stipulation. He can't now argue that the stipulated dismissals his counsel agreed to, through a process counsel agreed to, resulted in the discriminatory removal of Black prospective jurors or shed light on later discrimination in J.B.'s removal by peremptory challenge. (See *Clark, supra,* 63 Cal.4th at p. 567; *People v. Duff* (2014) 58 Cal.4th 527, 540 ["[A] stipulation to the excusal of jurors forfeits any subsequent objection to their omission from the jury pool"].)

For similar reasons, Battle can't rely on the fact that the prosecution unsuccessfully offered to stipulate to four Black prospective jurors prior to voir dire. With the exception of J.B., defense counsel ultimately accepted the stipulated excusals of the other three Black jurors during voir dire. In fact, counsel proposed the stipulated dismissal of one of these jurors, B.A., and acquiesced to the dismissal of another of these jurors, A.H. This certainly cuts against his argument. (See *Kelly, supra,* 42 Cal.4th at p. 780.) In any event, Battle's argument also fails because he cannot show that any of these proposed stipulations was "specious." (*Sánchez, supra,* 63 Cal.4th at p. 437.)

Battle also alleges the prosecutor unjustifiably questioned Black prospective jurors, including J.B., for much longer than any of the seated jurors or non-Black prospective jurors the prosecutor struck. He also asserts that the prosecutor disproportionately directed rhetorical flourishes to his pattern death-qualification questions — which often asked whether the prospective jurors would be able to directly tell the defendant of a death verdict — at Black prospective jurors. But the record doesn't support Battle's characterizations of voir dire. The thoroughness of the prosecutor's probing of J.B. or other Black

prospective jurors didn't involve a noticeably disproportionate number of questions and was not outside the norm of typical questioning. (Cf. *People v. Cunningham* (2015) 61 Cal.4th 609, 665.) Similarly, nothing suggests that the prosecutor's subtle phrasing variations resulted in Black prospective jurors experiencing more intense examinations. These variations pale in comparison to the graphic and irrelevant questions the Supreme Court disapproved of in *Miller-El v. Cockrell* (2003) 537 U.S. 322, 344 (prosecutor disproportionately gave Black jurors "an explicit account of the execution process").

Battle's argument that the prosecutor eagerly and unjustifiably urged the court to excuse for hardship J.K., another Black prospective juror, also lacks record support. Although a prosecutor's selective solicitude for minority jurors' hardship concerns can support a prima facie case (see *Snyder v. Louisiana* (2008) 552 U.S. 472, 483–484), the prosecutor displayed no such solicitude here. J.K was a full-time nurse seeking a master's degree in nursing. According to her, serving on the jury would have made it nearly impossible for her to fulfill her work and school obligations — particularly attending workplace meetings required for her master's program — and could have resulted in the loss of the $1,800 she paid for that semester. She repeatedly raised these concerns. In discussions at the bench, the trial court brought up to the attorneys that J.K. was going to lose $1,800 and began to suggest that J.K was a good candidate for excusal. The prosecutor agreed. But defense counsel disagreed, requesting that the court first ask J.K. to contact her employer to see if it was possible to rearrange the workplace meetings. Ultimately, the meetings couldn't be rearranged, and the court excused J.K. for hardship on its own accord. Under these circumstances, we can't say the prosecutor

eagerly or unjustifiably advocated for J.K.'s excusal. The prosecutor simply agreed with the court's assessment — clearly supported by the record — that J.K. faced a great hardship. Nor does Battle identify any non-Black prospective jurors where, as in *Snyder*, *supra*, 552 U.S. at pages 483–484, the prosecutor failed to show similar sympathy for their hardship concerns.

Finally, the prosecutor's justification for his peremptory strikes doesn't support an inference of discrimination. In response to the court's inquiry whether, after it denied the *Batson/Wheeler* motion, he wanted to put anything on the record, the prosecutor stated he felt he didn't need to justify his reasons. But he then stated that one of the Black jurors he had proposed stipulating to prior to voir dire, M.N., had clear death penalty reservations. After the court stated it was surprised M.N. had not previously been stipulated to since she had a son who had been murdered, the prosecutor stated M.N. was "one of the people I proposed to stipulate to. And that goes far beyond racial reasons." To the extent the "that" refers to M.N.'s son being murdered, Battle correctly points out that the prosecutor couldn't have been aware of this fact when he proposed to stipulate to M.N., as it came out during voir dire. And, as Battle observes, this strike justification didn't address the focus of defense counsel's *Batson/Wheeler* motion: J.B.'s excusal. Ultimately, though, we can't glean insight from these discrepancies. Because the trial court rejected the *Batson/Wheeler* motion at step one, the prosecutor wasn't obligated to state his reasons for challenging *any* prospective juror. (See *Banks*, *supra*, 59 Cal.4th at p. 1147.) So, there is nothing suspect about the prosecutor's failure to state his reasons for striking J.B. (See *id.* at p. 1148.)

Furthermore, "prosecutors may be reluctant to state their reasons for the record if doing so would jeopardize or nullify a ruling in their favor . . . ." (*Scott, supra*, 61 Cal.4th at p. 388.) To avoid this outcome, we must be careful at step one to consider only whether the prosecutor's stated rationale was facially insincere. (See *Kelly, supra*, 42 Cal.4th at p. 781; *Scott, supra*, 61 Cal.4th at pp. 390–391.) Here, the prosecutor's rationale was not facially insincere. To the extent the prosecutor partially misspoke about M.N.'s dismissal, Battle offers no reason why the prosecutor would have intentionally misstated the matter, as opposed to simply making an honest mistake. Such a mistake doesn't give rise to an inference of discrimination, particularly given the prosecutor's otherwise accurate statement that M.N. showed clear bias against the death penalty. (*Jones, supra*, 51 Cal.4th at p. 366.)

In short, Battle fails to demonstrate the trial court erred in denying his *Batson/Wheeler* motion. Although the racial context of the case raises some initial concerns, Battle's showing fails to establish a basis for inferring that the prosecution may have struck a particular Black juror because of her race. The small sample size of strikes against Black prospective jurors, and the fact that Battle challenges the excusal of only one such juror, severely undercuts any inference we can draw from the statistical evidence he presents. None of the remaining strike circumstances he identifies find any support in the record. Ultimately Battle's challenge rests on the strike of a single juror, after that juror had expressed misgivings about the death penalty. The circumstances surrounding the strike dispel any inference of discriminatory intent.

## III.  GUILT PHASE ISSUES

## A. Admission of Statements to Special Investigator Robert Heard

Battle contends one of his admissions to special investigator Robert Heard — that he knew there was a plan to kill the Demkos and that he participated in their murders — was involuntary and therefore inadmissible.  He argues that this involuntary statement tainted his subsequent, more incriminating admissions that he participated in the Demkos' murders.  We find no error.

### 1. Background

Battle focuses on three portions of the pretest interview that investigator Heard conducted.

First, after Heard took Battle through the version of events that Battle had told Detectives Gilliam and Pacifico the previous day, Heard pressed Battle for more details about the plan for the burglary.  Battle eventually explained that Neal and Left Eye told him he could take whatever was lying around the house as long as he "didn't bother with what their intentions were."  He explained that he didn't know about their full intentions — i.e., the full plan of the operation.  But he then said Neal told him they weren't really interested in much of what was inside the house, since they were going to try to take the victims' identities.  Left Eye also told him about "trying to take" the victims' house.  This colloquy ensued:

> "HEARD:  You mean take their house lift it up and take it somewhere?
>
> "BATTLE:  No.

"HEARD:  How?

"BATTLE:  Basically, like just . . .

"HEARD:  Get rid of them and just take the house?

"BATTLE:  Well, something like that. I didn't know
. . .

"HEARD:  Look at me. Does anything on my face say
that I'm shy or anything?

"BATTLE:  No. I'm just . . .

"HEARD:  I've been doing this for thirty years.

"BATTLE:  I'm just nervous.

"HEARD:  And I don't blame you for being nervous
and you know what, I'm sitting in this chair. I'm not
sitting in that chair. If I'm sitting in that chair, I'd
be nervous too. Because you know there's something
you need to understand Tommie is you're in a hole
right now.

"BATTLE:  I know.

"HEARD:  And you know what Tommie you got to
stop digging. Don't dig no more, okay? This will
because once I write my report, I can't promise to do

anything for you because if my boss found out that I promised you something that was untrue, I'd be in trouble. Tommie I've been doing this too long okay? Now I worked the burglary detail for many, many years. I worked the homicide detail for three and a half and you are fortunate enough that in this department these homicide detectives they're working homicide. Why? Because they're the best of the best. They are not stupid. You can't see stupid written across their forehead, okay? So, let's go back. Their intentions?

"BATTLE:  Their intentions was to take their credit.

"HEARD:  Take their house?

"BATTLE:  Yeah, Neil had mentioned a couple of times that he had hookup at DMV where he'd be able to use like the people's credit cards."

Following this exchange, investigator Heard asked Battle what the plan was for the victims; Battle responded that he had nothing to do with that.  He explained that he had concerns that something bad would happen to the victims, but that he didn't know what.

Investigator Heard then shifted interview tactics.  Using a mock polygraph question, he asked whether Battle had suspected before November that Neal planned on killing the victims.  Battle denied having any suspicions, and this exchange followed:

"HEARD: No. No. But you have to understand, okay? You're in the hole. My job is just to verify that you tell me the truth.

"BATTLE: Okay.

"HEARD: I don't care if they said something and you thought oh my God is that what they're going to do because as long as you're not involved in that, that's all that's important but the problem is that if I was to ask you on the polygraph exam see we're going to run with November thirteenth but the polygraph question is before you arrived at that house the day that this thing went down okay?

"BATTLE: Uh huh."

Finally, as investigator Heard pressed further on Battle's knowledge about a plan to kill the victims, Battle admitted he knew the victims would go "missing for a while." In the exchange that ensued, investigator Heard brought up Battle's godson several times:

"HEARD: Missing for a while? What does that mean?

"BATTLE: That's all [Neal] said.

"HEARD: I don't understand that. See now, see I've worked the homicide detail for three and a half years. You are, you are no dummy, okay? You're no

dummy. Are you telling me back in August when you had this conversation that you became concerned at that time that those people were going to be killed by someone else? Is that a yes, or no?

"BATTLE:  Yes, sir.

"HEARD:  Okay. Got it. Now . . .

"BATTLE:  It's not like I could back out though at that time.

"HEARD:  I understand.

"BATTLE:  Because if, if they tell me you know in so many words that they're basically going to do that if they can do that to them you know.

"HEARD:  They can do it to you?

"BATTLE:  Yeah.

"HEARD:  And your godson? Let me make sure because I don't want to put words in your mouth because I'd like to write something down if you'll allow me. In August of this year, two, thousand?

"BATTLE:  Yes, sir.

"HEARD:  You became aware of this plan to go hit this house, is that correct?

"BATTLE:  Yes, sir.

"HEARD:  Take the car. Is that a yes?

"BATTLE:  Yes, sir.

"HEARD:  Take their credit?

"BATTLE:  Yes, sir.

"HEARD:  Their identity?

"BATTLE:  Yes, sir.

"HEARD:  Their house?

"BATTLE:  Yes, sir.

"HEARD:  And kill them?

"BATTLE:  Yes, sir.

"HEARD:  Is that a yes, sir?

"BATTLE:  Yes, sir.

"HEARD:  Okay. Got it. Now what happens if you would have backed out at that point once you found out in August they were going to kill them?

"BATTLE:  I didn't know what was going to happen. I swear. I'm telling the truth.

"HEARD:  You got a godson. You got a godson to worry about. Now I'm glad that's out. That's a question I don't have to ask. I can just tell them you told me the truth about that. Can I write that down?

"BATTLE:  Yes, sir.

"HEARD:  Okay. Eleven, twenty knew I want you to see what I'm writing knew in August two, thousand the plan okay and that was the plan. Number one?

"BATTLE:  Yes, sir.

"HEARD:  Take ID, Number two take car. Number three take home. Number four they said you could take whatever was in the house?

"BATTLE:  Yes, sir.

"HEARD:  Valuables. And number five kill the residents. I won't put anything down. I won't put words in your mouth. You knew in August of two, thousand the plan, five things take their ID, take their car, take their home, take their valuables, and kill the two residents is that correct?

"BATTLE:  Yes, sir."

A little later in the interview, investigator Heard had Battle reiterate his admission that, as early as August, he knew there was a plan to kill the Demkos.

At trial, the prosecutor argued Battle's statements to investigator Heard, as well the statements to Detectives Gilliam and Pacifico, were voluntary and moved to admit them. The court conducted an evidentiary hearing where the three officers and Battle testified, and it listened to the audio recordings of the custodial interviews. After the hearing, Battle filed a response to the prosecution's motion, requesting that the court exclude his custodial statements from trial because they were involuntary. The trial court held that all of Battle's statements to law enforcement were voluntary and thus admissible. It reached this holding after concluding, among other things, that officers did not threaten Battle or promise him anything, and instead merely urged Battle to tell the truth.

*2. Analysis*

Both the federal and state Constitutions bar prosecutors from introducing into evidence a defendant's involuntary statement to government officials. (*People v. Holloway* (2004) 33 Cal.4th 96, 114 (*Holloway*).) This prohibition bars the admission of an involuntary confession, as well as an involuntary admission. (*People v. Haydel* (1974) 12 Cal.3d 190, 197.) In determining whether a statement is involuntary, "we consider the totality of the circumstances to see if a defendant's choice to confess was not ' " ' "essentially free" ' " ' because his will was overborne by the coercive practices of his interrogator." (*People v. Spencer* (2018) 5 Cal.5th 642, 672 (*Spencer*).) Coercive police conduct includes physical violence, threats, direct or

implied promises, or any other exertion of improper influence by officers to extract a statement. (*People v. Linton* (2013) 56 Cal.4th 1146, 1176 (*Linton*).) The presence of coercion is a necessary, but not always sufficient, predicate to finding a confession was involuntary. (*People v. Caro* (2019) 7 Cal.5th 463, 492.) We also consider other surrounding circumstances apparent from the record, including both the details of the interrogation and the characteristics of the accused. (*Ibid.*)

When a defendant challenges the admission of a statement on the grounds that it was involuntarily made, the state bears the burden of showing by a preponderance of the evidence that a defendant's statement was, in fact, voluntary. (See *Linton, supra,* 56 Cal.4th at p. 1176.) On appeal, we accept the trial court's factual findings as to the circumstances surrounding the confession, provided they are supported by substantial evidence, but we review de novo the ultimate legal question of voluntariness. (See *People v. Scott* (2011) 52 Cal.4th 452, 480.) On de novo review, we conclude that Battle's admission was voluntary.

We begin by noting that Battle's testimony at the suppression hearing undercuts his claim on appeal. On direct examination, investigator Heard came up only once, and only incidentally (i.e., as part of a discussion of how much sleep Battle had gotten prior to the polygraph examination). On cross-examination, Battle testified that he'd done the polygraph examination voluntarily, and that he never told investigator Heard at any point that he wanted to stop. By contrast, Battle testified extensively about Detectives Gilliam and Pacifico and their apparently coercive interview tactics. The absence of comparable testimony regarding investigator Heard gives us confidence that none of the officer's interrogation tactics coerced

Battle into admitting anything. (See *People v. Rundle* (2008) 43 Cal.4th 76, 120 [defendant's own testimony at suppression hearing established that his decision to confess was "completely separate from any representations made by the officers"]; *People v. Belmontes* (1988) 45 Cal.3d 744, 774 [similar].)

Also undercutting Battle's claim are the various indicia of voluntariness that he doesn't dispute, and in fact largely admits on appeal. Battle makes no allegation that he suffered any physical abuse. The court found that Battle — who was 26 years old at the time of the interviews — was "a very articulate, intelligent man." Investigator Heard didn't physically restrain Battle. Battle didn't request an attorney or express an unwillingness to speak with investigator Heard. He knew he could stop the examination "at any time." The entire process was not particularly long, totaling between three and three and a half hours. There were breaks during the interview and Battle was given water. And the trial court found that Battle was not exhausted during the interviews, but instead was "cogent" and "maintain[ed] a very, very consistent tone of voice, manner of talking, [and] coherency through[out] the interviews." These circumstances of the interview and the accused buttress the trial court's conclusion that Battle's statements to investigator Heard were voluntary. (See, e.g., *People v. Mendez* (2019) 7 Cal.5th 680, 698–699 (*Mendez*); *Spencer*, *supra*, 5 Cal.5th at pp. 672–674.) And they readily distinguish this case from those cases where we have found coercion. (See, e.g., *People v. Neal* (2003) 31 Cal.4th 63, 84.)

Battle nonetheless argues that his admissions to investigator Heard — particularly that he knew there was a plan to kill the Demkos — were involuntary because of what investigator Heard said to him. It's true that, as Battle

generally argues, investigator Heard repeatedly questioned whether he was telling the truth and insistently probed whether he knew there was a plan to kill the Demkos. But "[t]he business of police detectives is investigation, and they may elicit incriminating information from a suspect by any legal means." (*People v. Jones* (1998) 17 Cal.4th 279, 297.) Therefore, officers can, as investigator Heard did, exhort a suspect to tell the truth and repeatedly express that they believe a suspect is lying. (See, e.g., *Spencer*, *supra*, 5 Cal.5th at p. 674; *Linton*, *supra*, 56 Cal.4th at p. 1178.) And, just as investigator Heard did, officers can engage in "vigorous," repetitive questioning of suspects (*People v. Williams* (2010) 49 Cal.4th 405, 444 (*Williams*)) meant to ascertain a defendant's involvement in crimes (see *Linton*, *supra*, 56 Cal.4th at p. 1178). Given Battle's explanations that Neal and Left Eye had told him in advance about the burglary plan and that he could "get basically whatever was lying around the house as long as [he] didn't bother with what their intentions were," it was natural that investigator Heard then doggedly asked if Battle knew the plan was to kill the Demkos (see *Linton*, *supra*, 56 Cal.4th at p. 1178; *Williams*, *supra*, 49 Cal.4th at p. 447) — particularly as Battle was evasive.

Moreover, investigator Heard's exhortations and persistent questions were relatively "low key." (*Linton, supra*, 56 Cal.4th at p. 1178; see *Spencer, supra*, 5 Cal.5th at p. 673.) Nothing in Battle's responses indicate he was unable to parry the " 'various thrusts and efforts . . . to . . . catch him in what [Heard] perceived as untruths or lies.' " (*People v. McWhorter* (2009) 47 Cal.4th 318, 358.) Battle was evasive on whether he knew details of the burglary plan. This evasion "suggests . . . a still operative ability to calculate his self-interest in choosing

whether to disclose or withhold information." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 58 (*Coffman*).)

We see no basis to conclude the interrogation overbore Battle's will. Battle ultimately did admit to investigator Heard that he learned in August that the plan involved killing the Demkos. But as the Attorney General suggests, Battle's admission also potentially reflects a desire to cooperate for the purposes of exculpating himself. Indeed, through the limited admission that he knew of the plan sometime in advance, Battle continued to tell a version of events that minimized his involvement: He immediately told investigator Heard that, despite his knowledge, there's no way he could have backed out, because Neal and Left Eye could have killed him. (Cf. *Holloway*, *supra*, 33 Cal.4th at p. 116.) This is consistent with the narratives Battle gave to the detectives *prior to* his interview with investigator Heard. "[He] had the wherewithal to articulate — time and again — a version of events that minimized his involvement. Along the way, he changed his story from one emphasizing that he knew nothing about the offense[s], to one admitting he was at the [burglary with a group of coconspirators] but maintaining he had not participated in the killing[s]" and had no knowledge of a plan to kill the victims. (*Spencer, supra*, 5 Cal.5th at p. 673.) And it's consistent with Battle's repeated minimizations *after* he made the admission he now complains of: He changed his story from one denying being present at the murder scene to one admitting he was at the murder scene but accusing another participant of committing the murders, to one admitting he stabbed the victims but while being forced at gunpoint by one of his coconspirators, to one admitting that he burglarized the victims' home but accusing a

housemate of his — a completely different perpetrator than the one he had initially described — of committing the murders.

Given these circumstances, we may readily reject Battle's specific claims regarding the three interrogation tactics that he identifies as improper.

Battle first argues investigator Heard made an implied, time-sensitive promise of lenity by telling him he should "stop digging" and stating that "once I write my report, I can't promise to do anything for you because if my boss found out that I promised you something that was untrue, I'd be in trouble." He contends investigator Heard's later, repeated references to "writ[ing]" down Battle's recitations of the burglary plan indicate the officer was, in the moment, communicating his intent to carry out his end of the bargain. But no suspect would have reasonably understood investigator Heard's statements as promising "any particular benefit." (*Holloway*, *supra*, 33 Cal.4th at p. 116.) Although it's not entirely clear what exactly investigator Heard meant when he briefly mentioned "promis[ing]" something, it's certainly clear that investigator Heard wasn't making a specific promise of leniency. (See *Coffman*, *supra*, 34 Cal.4th p. 61.) He gave no indication that he or anyone else would grant Battle anything if Battle gave more details about the burglary plan. (See *Holloway*, *supra*, 33 Cal.4th at p. 116 [similar]; *People v. Carrington* (2009) 47 Cal.4th 145, 174 (*Carrington*) [similar].) And, in any event, "I can't promise to do anything for you" after I write my report, is not, as Battle asserts, the same as affirmatively stating, "I promise to do something for you if you do provide further information before I write my report." Warning arrestees that the possibility of help disappears if they do not act is not the same as promising to help if they do act.

At most investigator Heard was, during the broader exchange in which he made the "promise" statement, simply informing Battle of the obvious:  Cooperating and being honest would generally be beneficial to Battle, whereas "digging" deeper into a lie and being caught in it down the line would be detrimental.  Our cases make clear that such an interrogation strategy "did not cross the line from proper exhortations to tell the truth into . . . promises of leniency."  (*Holloway*, *supra*, 33 Cal.4th at p. 115.)  Officers may comment on the " 'realities' " of a suspect's position and the choices available to him (*id.* at p. 116), including by informing him that "full cooperation might be beneficial in an unspecified way" (*Carrington*, *supra*, 47 Cal.4th at p. 174; see *id.* at p. 171).

We likewise easily dispose of Battle's second complaint: that investigator Heard seriously misled him regarding his potential criminal liability.  Battle focuses on investigator Heard's statement that "I don't care if they said something and you thought oh my God is that what they're going to do because as long as you're not involved in that, *that's all that's important* . . . ."  (Italics added.)  According to Battle, this statement communicated that Battle could acknowledge knowing of the murder plan without getting in bigger trouble, so long as he hadn't participated in the actual killings.  Yet, as he observes, any experienced homicide investigator would have known that such an admission could be highly incriminating:  It could implicate Battle as an accomplice in premeditated and deliberate murder and serve as proof to support special circumstances for felony murder, multiple murder, and aggravating personal culpability.

Battle's argument fails, though, because he takes investigator Heard's statement out of context.  Immediately

before the quote Battle relies on, investigator Heard stated his job was just to verify that Battle was telling the truth. Immediately after the quote, investigator Heard stated, "but the problem is that if I was to ask you on the polygraph exam see we're going to run with November thirteenth, but the polygraph question is before you arrived at that house the day that this thing went down, okay?" It's clear from this context that investigator Heard was merely informing Battle that, if Battle had known in advance about the murder plan but denied this when asked during the polygraph, he'd fail the question. "[T]hat's all that's important" fits naturally into this exchange. In other words, he simply told Battle it was no use to lie about his prior knowledge, not that admitting such knowledge had minimal legal consequences. (Cf. *Carrington, supra*, 47 Cal.4th at p. 172 [not coercive that officer told defendant admitting to the murder " 'wouldn't make any difference' " since, in context, the statement reflected the overwhelming evidence].)

Even assuming investigator Heard's statement did refer to legal consequences, it had no proximate causal connection to Battle's subsequent admission. (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1240.) That readily distinguishes this case from *People v. Cahill* (1994) 22 Cal.App.4th 296, the chief case upon which Battle relies. *Cahill* also concerned a burglary-murder. There, a homicide investigator provided a detailed discussion of California law and unmistakably conveyed a clear, false message: The defendant could avoid being "tried for first degree murder" if "he admitted that he was inside the house and denied that he had premeditated the killing." (*Id.* at p. 314; see *id.* at p. 315 [such an admission would amount to a confession of felony murder].) The court explained that the investigator's false statement proximately caused the confession of the young

defendant — who up until this point had, in the face of vigorous questioning and confrontation with damning facts, resisted conceding his presence in the home — because it might have offered him a false hope he could be cleared of the most serious charges against him. (*Id.* at p. 317.)

Yet here, investigator Heard's vague, passing comment communicated "no such misleading assurances" (*Holloway*, *supra*, 33 Cal.4th at p. 117), and plainly had no effect on Battle. Immediately after investigator Heard's apparently misleading statement, Battle did not change the story he was then telling — i.e., that he had exited the car on the way to the desert, with the Demkos still alive and in the trunk. And as the Attorney General observes, if investigator Heard's comments somehow caused Battle to admit knowing about the murder plan, they would have also prevented him from admitting further involvement — since they allegedly indicated that Battle would not be in bigger trouble *as long as* he hadn't participated in the murders. But Battle eventually admitted not only that he knew of the murder plan, but also that he was present at the murder scene and stabbed the victims himself.

Finally, Battle argues that investigator Heard inappropriately played on Battle's fears for the safety of himself and his godson Marquis by misleadingly suggesting those fears justified Battle's participation in the burglary plan, even if he knew the victims would be murdered. He also argues, in passing, that the statements about Marquis could be perceived as an indirect threat that others might harm Marquis if Battle continued to implicate coconspirators and didn't take full responsibility for the crimes.

Neither contention withstands scrutiny. Nothing in investigator Heard's reference to Marquis could be interpreted as a threat. And nothing about investigator Heard's discussion of Marquis was inappropriate. Investigator Heard could have discussed Marquis in order to build a "rapport" with Battle and communicate he was trying to better understand Battle's motivation for participating in the crimes. (*Williams*, *supra*, 49 Cal.4th at p. 447; see *Carrington*, *supra*, 47 Cal.4th at pp. 171, 174.) He also could have referenced Marquis as a permissible followup to Battle's own discussion of Marquis. (See *Spencer*, *supra*, 5 Cal.5th at p. 675.) Earlier in the interview, Battle brought up Marquis several times. Right before investigator Heard referenced him, Battle explained that he couldn't back out once he learned from Neal and Left Eye about the murder plan, because "if they tell me you know in so many words that they're basically going to do that[,] if they can do that to them[,] you know." Investigator Heard understandably interjected by articulating what Battle implied: If his coconspirators could murder the victims, they could murder him and Marquis. (See *Linton*, *supra*, 56 Cal.4th at p. 1178.)

## B. Admission of Statements to Detectives Gilliam and Pacifico

Battle argues that the trial court erred by declining to order the redaction of statements he made during his custodial interviews with Detectives Gilliam and Pacifico. We conclude that Battle identifies no reversible error.

### 1. Background

After the trial court ruled the tapes and transcripts of Battle's custodial interrogations were admissible, it held that certain statements had to be redacted before the evidence could

be presented to the jury:  namely, all mention of Battle's "being in prison, being on parole, having priors for burglary, shooting other people, stabbing other people, [and] being an ex-con."  The prosecution redacted the tapes and transcripts accordingly.  But defense counsel moved for the court to order further redaction of two remaining sets of statements from Battle's custodial interviews with police detectives.

First, defense counsel sought to redact several comments that, according to counsel, indicated Battle had previously committed burglary.  At a hearing on March 17, 2003, defense counsel pointed the trial court to the following exchange between Battle and Detective Gilliam during the initial custodial interview.  The exchange took place after the detective asked Battle why the burglary group approached the Demkos' home from different directions:

> "BATTLE:  Ah, me, I don't know he, Neil was basically trying to tell me that, that, that I looked stressed out.
>
> "GILLIAM:  Ah huh.
>
> "BATTLE:  And um that I should, I've done it before ah I, I shouldn't sweat it cause he said I was looking all clammy and stuff. I didn't really pay that much attention.
>
> "GILLIAM:  Did you guys ah . . .
>
> "BATTLE:  Because I always look kind of shaky . . .

"GILLIAM:  Ah huh.

"BATTLE:  Before I do something."

Defense counsel argued that Battle's statement that he always looked shaky before doing something "created a definite inference that there's been a prior," but the court rejected this argument without comment.  The trial court did, however, say that defense counsel had a point about Battle's comment "I've done it before."  The prosecutor explained that this comment could be interpreted as Battle recounting how Neal told him he didn't have to worry because *Neal* had committed burglary before, and therefore didn't necessarily refer to Battle being the one who had "done it before."  After reading the transcript and considering the context of the comment, the trial court agreed with the prosecutor and further noted that Battle didn't say what he had "done."  On this basis, the court found that nothing was "improper" about Battle's comment.  Given the opportunity to respond for the record, defense counsel argued that the comment, taken in context, indicated Neal said Battle shouldn't be stressed because Battle had done burglary before; then, Battle said he didn't pay "much attention" to this advice because he always looked "shaky" before doing something.  Defense counsel urged that this provided an inference that Battle was an experienced criminal.  The trial court stated this was "one interpretation" and declined to strike the comment.

At the hearing on March 18, defense counsel sought to redact additional statements made by Battle during his November 27 interrogation by detectives, claiming these statements also implicated prior burglaries.  Counsel first objected to the admission of Battle's response to Detective

Pacifico's question about why Battle had been asked to go back into the victims' house after the crimes. Battle responded saying that he didn't know because, as he had explained, "I never did anything I never did anything like this, especially with people. I never did anything with anybody." The trial court refused to strike the statement, finding the probative value outweighed the prejudice.

Counsel next objected to Battle's statement a little later in the interrogation where, responding to Detective Pacifico's question asking why Battle hadn't covered his face with pantyhose or worn a beanie (like his fellow coconspirators) during the burglary, Battle stated, "Huh, like I said, I'd never uh, worked with a team or anything like that before. . . . I, I was just used to having gloves." Counsel argued this statement, together with the prior identified comment, implied that Battle had done burglaries in the past while using gloves. The court disagreed. It questioned whether, given the prosecution's position that Battle lied during this confession, it made any difference that this statement was being admitted. It ultimately concluded there was nothing particularly damning about the statement — observing that if Battle had said " 'When I did my other burglaries, I did it this way,' well, then maybe that's something to talk about" — and allowed the statement because its probative value outweighed its prejudicial effect.

Finally, counsel objected to three statements Battle made while describing the burglary and its aftermath. In describing his entry into the Demkos' home, Battle said, "The man was awake, and I had never break, broken into a house with somebody that was there"; in describing how he gained access to the house, he said, "I mean old couples, they usually leave the back door unlocked, if they have a fenced in area and have dogs

. . . I'm just, I'm just used to that"; and, in describing what happened when he got back to the Christian Living Home, he said, "I'm practically in tears when I get back to the house, cause I guess that I've never did anything with people in the house before." Defense counsel argued these statements clearly implied not only that Battle had previously committed burglaries, but also that he had previously burglarized elderly people's homes — an implication counsel asserted was irrelevant and highly prejudicial. The court reasoned that it was a stretch to interpret these statements as Battle saying, "I did a prior burglary," and it admitted the statements after determining their probative value outweighed their prejudicial effect.

In addition to the custodial statements potentially implicating prior burglaries, defense counsel also sought to redact Battle's brief discussion of his sword collection during the November 26 interrogation. The relevant exchange began after Battle denied participating in the burglary and stated he had simply been asked to get rid of the TV and VCR:

> "BATTLE: So, and I was already, because I needed some money, I was already taking my movies to the pawn shop cause I had a lot of movies to pawn or, or sell. I even had some, I had started, ah, a blade collection again but I had to get rid of them, so I pawned those as well.

> "GILLIAM: What's a blade collection?

"BATTLE:  Well, I had ah, ah Dragon like a knife type of sword and I had ah, ah, ah antique like ah, ah Irish sword.

"GILLIAM:  Just two?

"BATTLE:  Yeah, just two.

"GILLIAM:  Where did you pawn those at?

"BATTLE:  Um I don't know the name of it, but it's on 7th St. . . .

"GILLIAM:  Did you pawn it in your name?

"BATTLE:  Yes."

Defense counsel first objected to the admission of the sword collection evidence on the ground that it was completely irrelevant to the case.  The trial court responded that "[t]here's a lot of stuff in this interview that was irrelevant."  Counsel then argued the evidence should be excluded under Evidence Code section 352 because it created an inference Battle was an experienced user of knives with a large blade collection, making it more likely (in the eyes of the jury) that he perpetrated the stabbings of the Demkos.  The court rejected this argument, finding that the probative value of the sword statement evidence outweighed its prejudicial effect.

### 2. Analysis

Under Evidence Code section 350, only relevant evidence is admissible.  Relevance is a low threshold.  (See Evid. Code, §

210 [" 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action"].) Under Evidence Code section 352, though, even relevant evidence is inadmissible "if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." And under Evidence Code section 1101, subdivision (a), "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." We review the trial court's rulings on relevance and the admission of evidence under Evidence Code sections 352 and 1101 for abuse of discretion. (*People v. Cole* (2004) 33 Cal.4th 1158, 1195.)

Battle argues the trial court abused its discretion because, as defense counsel urged at trial, the statements concerning the sword collection and potentially implicating prior burglaries were irrelevant and unduly prejudicial. He also argues the court abused its discretion because these statements violated Evidence Code section 1101, subdivision (a)'s prohibition against propensity character evidence, and he further contends that the admission of these statements deprived him of his right to a fair trial under the due process clause of the Fourteenth Amendment. There is no dispute that Battle's Evidence Code section 352 objection preserved his federal due process claim for appeal, even though he didn't raise the specific claim below. (*People v. Partida* (2005) 37 Cal.4th 428, 433–439.) But the parties disagree whether Battle preserved any character-

evidence objection. We assume that Battle preserved the objection. But we conclude the trial court's decision to admit the statements concerning the sword was not erroneous, and that any error in its decision to admit the statements implicating prior burglaries was harmless.

### a. *Sword Collection Statements*

The sword collection statements that Battle challenges clearly met the minimal threshold Evidence Code section 351 sets for relevance. Admittedly, neither the prosecution nor the trial court offered any particular rationale for the statements' relevance. In fact, the trial court twice responded to Battle's objection to the statements by remarking that "a lot of" things in the interviews were "irrelevant." But we don't take that to mean that the court stated that the evidence was wholly irrelevant. The trial court's phrasing, although certainly not model language, is better understood in context as an observation that the sword statements, like much of what Battle had discussed in the interviews, was irrelevant to the actual burglary and murders. In any event, our task is to "review the [trial court's] ruling, not [its] reasoning" or the arguments below; "if the ruling was correct on any ground, we affirm." (*People v. Geier* (2007) 41 Cal.4th 555, 582.) Here, a major part of the jury's task at trial was to evaluate Battle's shifting statements, and to decide what, if anything, was true. It therefore was not an abuse of discretion for the court to decide that all of the things Battle said were relevant to the jury's determination of what to believe.

More specifically, the sword statements were relevant to Battle's early versions of events minimizing his involvement in the burglary — versions the prosecutor argued were dishonest

and showed Battle was engaged in a coverup in the custodial interviews.[11] Battle's mention of his sword collection related to his initial discussion of how he "innocently" ended up with the Demkos' TV and VCR. In other words, Battle brought up the swords in the context of his exculpatory statements for why he had the Demkos' property, which in turn formed a key piece of Battle's slowly unfolding story regarding his involvement in the crimes. For these reasons, we find readily distinguishable the two knife-evidence cases Battle relies on. Neither involved evidence that related in any way to the defendants' discussion of their involvement in the crimes. (See *Alcala v. Woodford* (9th Cir. 2003) 334 F.3d 862, 886–888; *McKinney v. Rees* (9th Cir. 1993) 993 F.2d 1378, 1383 (*McKinney*).)

Additionally, the admission of the sword statements did not create undue prejudice under Evidence Code section 352 — certainly not to the extent that their admission amounted to an abuse of discretion. (See *People v. Jones*, *supra*, 17 Cal.4th at p. 304 ["We will not disturb a trial court's exercise of discretion under Evidence Code section 352 ' "*except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice" ' "].) Battle mentioned his sword collection very briefly — during only a few seconds out of the many hours of the custodial interviews — and in passing.

---

[11] In some sense, we can understand the prosecution's strategy of showing Battle's false statements as suggesting consciousness of guilt. Battle's later explanation for why he lied — fear of and desire to protect Washington — does not change this fact. (*People v. Hughes* (2002) 27 Cal.4th 287, 335.)

These considerations, and that Battle referred to the swords merely as part of his initial exculpatory version of events, strongly indicates the jury was unlikely to draw any inference that Battle had a special interest in using blades that made it more likely he was the one who killed the Demkos with a knife. And since the murder weapon was a knife and not a sword, there is no reason to believe, as Battle briefly suggests, the jury might have considered Battle's decision to pawn the swords as showing he used them in the crimes and his consciousness of guilt. The context of the sword statement easily distinguishes this case from the chief authority Battle relies on, *McKinney*, where the prosecution featured the knife evidence prominently and with the overt, prejudicial intent of casting the defendant in a bad light. (*McKinney*, *supra*, 993 F.2d at pp. 1385–1386 & fn. 10.)

Assuming Battle has preserved for appeal an objection to the statements under Evidence Code section 1101, subdivision (a), that argument fails on the same grounds. It's clear from context that the sword statements were not admitted to establish conduct in conformity with a character trait or prior act. (See *People v. Bryant, Smith & Wheeler* (2014) 60 Cal.4th 335, 413 [similar].)

Many of the considerations described above lead us to reject Battle's claim that the admission of the sword statements "so infected the trial with unfairness as to make the resulting conviction a denial of due process." (*Donnelly v. DeChristoforo* (1974) 416 U.S. 637, 643.) Nothing in the record indicates the admission of the statements was "so inflammatory as to prevent a fair trial." (*Duncan v. Henry* (1995) 513 U.S. 364, 366.)

### b. *Statements Implicating Prior Burglaries*

We assume, without deciding, that the trial court erred under Evidence Code section 352 in admitting the statements that Battle identifies as implicating prior burglaries. But we hold that any such error was harmless as a state law matter (*People v. Watson* (1956) 46 Cal.2d 818, 836) and constitutional matter (*Chapman v. California* (1967) 386 U.S. 18, 24). Battle fails to show that there was any probability he would have received a more favorable result had the court redacted these statements.

The evidence presented of Battle's guilt was strong. His stories of what happened shifted dramatically during each custodial interview — and the prosecution was able to use these shifts to show Battle lied to officers and was attempting to falsely exculpate himself. And although his story kept shifting, key facts he revealed along the way matched or were corroborated by other evidence presented, including particular details of the burglary scene, the autopsy findings, and forensic reports of the murder scene; testimony from his friends and acquaintances; and items from the burglary scene that were either found in Battle's possession or linked to him.

Battle fails to show that, in the face of this strong evidence, the statements implicating prior burglaries prejudiced him. Common sense dictates that any risk of prejudice was marginal at best, particularly given (a) Battle's admission, contemporaneous with the statements allegedly implicating prior burglaries, that he had in fact burglarized the Demkos' home; and (b) Battle's later admission that he was the one who stabbed the Demkos.

## IV.   PENALTY PHASE ISSUES

## A. Denial of Defendant's Request for a Lingering Doubt Instruction

Battle argues that the trial court erred in refusing to instruct the jury at the penalty phase on lingering doubt. (See *People v. Gay* (2008) 42 Cal.4th 1195, 1218 [" 'The lingering doubts of jurors in the guilt phase may well cast their shadows into the penalty phase and in some measure affect the nature of the punishment' "].) Battle requested the following instruction: "It is appropriate for the jury to consider in mitigation any lingering doubt it may have concerning defendant's guilt. Lingering or residual doubt is defined as that state of mind between beyond a reasonable doubt and beyond all possible doubt." The trial court refused to give the instruction but acknowledged defense counsel was permitted to argue lingering doubt to the jury. And defense counsel's penalty phase opening argument highlighted lingering doubt as one of the "three themes for life." Although conceding this court has previously held otherwise, Battle argues he was entitled to a lingering doubt instruction, violating his constitutional rights.

We reject Battle's claim that the trial court erred in refusing to instruct the jury on lingering doubt. We have previously concluded that "the standard instructions on capital sentencing factors, together with counsel's closing argument, are sufficient to convey the lingering doubt concept to the jury." (*People v. Hartsch* (2010) 49 Cal.4th 472, 513; see also *People v. Jackson* (2016) 1 Cal.5th 269, 369–370 ["Neither state nor federal law requires a trial court to instruct a penalty jury to consider lingering doubt as a factor in mitigation"].) Battle does not dispute that the trial court instructed the jury with the

standard sentencing factors or that his attorney argued lingering doubt extensively.[12]

## B. Restriction on Execution-impact Evidence as Given in CALJIC No. 8.85

Battle argues that the trial court erred in instructing the jury with the following language from CALJIC No. 8.85, factor (k): "Sympathy for the family of the defendant is not a matter that you can consider in mitigation. Evidence, if any, of the impact of an execution on family members should be disregarded unless it illuminates some positive quality of the defendant's background or character."

Battle acknowledges that the instruction correctly states the law under *People v. Ochoa* (1998) 19 Cal.4th 353 (upon which CALJIC No. 8.85, factor (k) is based), and subsequent cases (see, e.g., *People v. Smith* (2005) 35 Cal.4th 334, 367 ["[E]vidence that a family member or friend wants the defendant to live is admissible to the extent it relates to the defendant's character, but not if it merely relates to the impact of the execution on the witness"]). But he contends the instruction was faulty as applied to the "unique circumstances of his case" because its "ambiguous" language unconstitutionally restricted the jury from giving effect to a significant part of the family impact testimony he presented: the testimony from his biological family, who had been estranged from him for nearly his entire

---

[12] Based on our resolution of this claim, we deny Battle's motion requesting that we take judicial notice of various records in *People v. Edwards* (2013) 57 Cal.4th 658, 765 (denying lingering doubt instruction on similar grounds).

life. Biological family members testified that they loved him, had fond memories of him as a young child, and wanted to reestablish a relationship with him. According to Battle, the jury could have had difficulty giving weight to this "constitutionally relevant" testimony under CALJIC No. 8.85, factor (k), because no obvious link existed between the family's feelings — based on the Battle they knew as a very young child — and positive aspects of Battle's character.

Battle's arguments lack merit. Contrary to his assertion, there was nothing ambiguous about CALJIC No. 8.85, factor (k). To the extent Battle rightly observes that the jury would have struggled to give weight to the love and desire for reconnection expressed by these family members, that doesn't reflect a defect in CALJIC No. 8.85, factor (k). Instead, it reflects how the testimony did not represent appropriate mitigation evidence, as it failed to provide any information about his positive qualities beyond the age of four, and how CALJIC No. 8.85, factor (k) thereby properly restricted its consideration by the jury.

Finally, we reject Battle's alternative argument that CALJIC No. 8.85, factor (k) is facially unconstitutional because, by precluding the jury from considering sympathy for his family as mitigation evidence, it violated the Eighth and Fourteenth Amendments of the federal Constitution. As he acknowledges, we have previously rejected similar claims (see, e.g., *People v. Williams* (2013) 56 Cal.4th 165, 197–198), and we decline to revisit our precedent.

### C. Constitutionality of California's Death Penalty Law

Battle raises several constitutional challenges to California's death penalty scheme. We have rejected these

claims in prior cases, and Battle does not persuade us to reconsider those decisions here. We reject Battle's claims on the merits, as follows:

The special circumstances enumerated in section 190.2, which render a defendant eligible for the death penalty, are not unconstitutionally overbroad. (*People v. Eubanks* (2011) 53 Cal.4th 110, 153; see also *People v. Bell* (2019) 7 Cal.5th 70, 130 [" 'Section 190.2 adequately narrows the category of death-eligible defendants and is not impermissibly overbroad under the requirements of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution' "].) The special circumstances are not so numerous that they "fail to perform the constitutionally required narrowing function." (*Williams*, *supra*, 49 Cal.4th at p. 469.)

Section 190.3, factor (a), which allows the jury to consider the "circumstances of the crime," does not result in the arbitrary and capricious imposition of the death penalty. (*People v. Peoples* (2016) 62 Cal.4th 718, 806.)

Battle also raises a host of arguments asserting that the death penalty statute and its accompanying jury instructions fail to set forth the appropriate burden of proof. These arguments are unavailing, as we see no reason in this case to revisit our previous decisions on this front. (*Mendez, supra,* 7 Cal.5th at p. 717 [a jury is not required to find death is an appropriate punishment beyond a reasonable doubt; to find that aggravating factors were proven beyond a reasonable doubt; or to agree unanimously that a particular aggravating circumstance exists]; *People v. Boyce* (2014) 59 Cal.4th 672, 724 [the trial court is not required to instruct that the prosecution carries the burden of proof at the penalty phase, nor must it

instruct that there is no burden of proof at the penalty phase; a jury is not required to agree unanimously that unadjudicated offenses were proven]; *People v. Johnson, supra*, 8 Cal.5th at p. 527 [the term "so substantial" does not make unconstitutionally vague the instruction as to when jurors may impose the death penalty; trial court is not required to instruct the jury to presume that life is the appropriate penalty]; *People v. Salazar* (2016) 63 Cal.4th 214, 256 [CALJIC No. 8.88's instruction to consider whether the death penalty is warranted under the circumstances, rather than if it is the "appropriate" penalty, does not violate the Eight and Fourteenth Amendments of the federal Constitution]; *Scott, supra*, 61 Cal.4th at p. 407 [trial court is not required to instruct the jury that it must return a verdict of life without parole if the mitigating evidence outweighs the aggravating evidence]; *People v. Loy* (2011) 52 Cal.4th 46, 78 [instructions don't impermissibly fail to inform jurors regarding the standard of proof and lack of need for unanimity as to mitigating circumstances].)

Battle next argues that the trial court's instructions on mitigating and aggravating factors violated his constitutional rights by using restrictive adjectives like "extreme" and "substantial" in the list of mitigating factors, failing to omit inapplicable sentencing factors, and failing to instruct that mitigating factors are solely relevant as potential mitigators. We have previously rejected these arguments. (*Reed, supra*, 4 Cal.5th at p. 1018 [using restrictive adjectives like "substantial" and "extreme" to describe mitigating factors does not violate the federal Constitution]; *id.* at p. 1017 [failing to omit inapplicable sentencing factors does not violate the federal Constitution]; *People v. Winbush* (2017) 2 Cal.5th 402, 490 [trial court not

required to instruct jury that mitigating factors are relevant solely as potential mitigators].)

Similarly unavailing are Battle's contentions that a jury is required to make written findings. (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1097 ["Written findings by the jury during the penalty phase are not constitutionally required, and their absence does not deprive defendant of meaningful appellate review"].)

We have also determined that the federal Constitution does not require intercase proportionality review (*People v. Williams* (2016) 1 Cal.5th 1166, 1205), and California's death penalty scheme does not deny capital defendants equal protection (*People v. Rivera* (2019) 7 Cal.5th 306, 348). Existing international law also does not prohibit imposition of the death penalty in the United States. (*People v. Capers* (2019) 7 Cal.5th 989, 1017.)

### D. Cumulative Error

Battle raises a cumulative error claim regarding the penalty phase. Because we have found no penalty phase errors, there is no cumulative prejudice to consider.

### V.    DISPOSITION

We affirm the judgment.

**CUÉLLAR, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CORRIGAN, J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**

PEOPLE v. BATTLE

S119296

Dissenting Opinion by Justice Liu

In *Johnson v. California* (2005) 545 U.S. 162 (*Johnson*), the United States Supreme Court determined that this court had established an "inappropriate yardstick by which to measure the sufficiency of a prima facie case" at the first step of analyzing a claim of racial discrimination in the exercise of peremptory challenges.  (*Id.* at p. 168; see *Batson v. Kentucky* (1986) 476 U.S. 79, 96–98 (*Batson*) [establishing three-step framework for analyzing such claims].)  *Johnson* rejected this court's rule requiring a defendant to show at the first step a " 'strong likelihood' " (i.e., it was " 'more likely than not' ") that the disputed strike was motivated by race, and instead held that an inference that "discrimination may have occurred [is] sufficient to establish a prima facie case under *Batson*." (*Johnson*, at pp. 166–167, 173, italics omitted.)  We have described this as a "low threshold."  (*People v. Scott* (2015) 61 Cal.4th 363, 384 (*Scott*).)

Today's opinion strays from this standard, if not in word then in deed, by "relying on judicial speculation to resolve [a] plausible claim[] of discrimination."  (*Johnson, supra*, 545 U.S. at p. 173.)  This is a dubious practice:  "The *Batson* framework is designed to produce actual answers to suspicions and inferences that discrimination may have infected the jury selection process. [Citation.]  The inherent uncertainty present in inquiries of discriminatory purpose counsels against engaging in needless and imperfect speculation when a direct

1

answer can be obtained by asking a simple question." (*Id.* at p. 172.) Because "the sum of the proffered facts" in this case readily "gives 'rise to an inference of discriminatory purpose'" (*id.* at p. 169), I respectfully dissent from today's contrary holding and judgment.

## I.

As today's opinion acknowledges, the racially charged nature of this case is "significant" and "'highly relevant to whether a prima facie case existed.'" (Maj. opn., *ante*, at p. 31.) Defendant Thomas Battle, a Black man, was charged with kidnapping and killing two White victims. He was tried, convicted, and sentenced to death by an all-White jury in 2003. Defense counsel planned to introduce, and did introduce, evidence that Battle had been the victim of racial discrimination during his childhood as a mitigating factor in the penalty determination. When the prosecutor struck Prospective Juror J.B., a Black woman, he was aware that the defense planned to present evidence of racial discrimination because defense counsel had asked one prospective juror, "Now, hypothetically, if there was something — I'm not saying this is going to come up, I just want to present you with a possibility — that I presented something from Mr. Battle's childhood that — in which he might have been the victim of racism, would that — that would be offensive to you if I argued that?"

J.B. was qualified to serve as a juror in Battle's trial. She was 52 years old, had a master's degree in school administration and school psychology, and worked as an elementary school teacher. She had previously served on a jury that reached a verdict. She had been the victim of a violent robbery in her

home, and one of her sisters had previously been in local law enforcement.

J.B. expressed a willingness to impose the death penalty and indicated she would make a penalty judgment based on the facts and evidence. In her questionnaire, she indicated she neither favored nor opposed the death penalty and had no moral, philosophical, or religious objections to the death penalty. She said she would not automatically vote either for life or for death and would instead consider and weigh all mitigating and aggravating factors in the case. She thought Texas used the death penalty too frequently, but California used it "about right." During voir dire, J.B. explained she could consider both the death penalty and a life sentence. She said she wouldn't have a problem voting for death "as long as all the facts were proven." When the prosecutor asked if she could look at the defendant and tell him death is the appropriate sentence, J.B. responded, "I don't have a problem with that. I'm my own person. I don't let anyone sway me right or left. I have to go by what I feel."

The court points to two statements in the record that it contends "necessarily dispel any inference that discrimination motivated [J.B.'s] excusal." (Maj. opn., *ante*, at p. 44.) First, in response to the jury questionnaire's prompt asking what a sentence of "death by lethal injection or death in the gas chamber" would "mean to you," J.B. answered: "Curel [sic]. Inhumane. Why?" This answer, in isolation, could have provided a rationale for J.B.'s excusal. But upon questioning by the prosecutor at voir dire, J.B. clarified that her comment was addressed to the possibility that innocent people had been executed in Texas: "I just felt that that was so inhumane to execute someone for something they didn't do." The prosecutor

responded, "Right. No. And I think everybody would agree with you." The prosecutor then asked J.B. whether "what happened in Texas" would cause her to "say, Well, I know about perhaps there have been some innocent people that have been put on death row. I don't want to make that mistake; I'm not going to vote for death. It's just easier. I will give him life without parole?" J.B. said "No" and went on explain that she would decide the matter based on "the law" and "what was proven."

The prosecutor was not required to accept J.B.'s statements at face value. But if the prosecutor had doubts about J.B.'s explanation, those doubts are not part of the record. The prosecutor had no obligation to give a reason for striking J.B. after the trial court found no prima facie case, and the prosecutor declined to do so. But this means we have no indication of the prosecutor's *actual* doubts, and J.B.'s "cruel" and "inhumane" answer, in context, was hardly an obvious reason for striking her.

Second, the court points to a statement J.B. made immediately following the exchange above. (Maj. opn., *ante*, at p. 41.) As noted, the prosecutor asked J.B. whether she would "say, Well, I know about perhaps there have been some innocent people that have been put on death row. I don't want to make that mistake; I'm not going to vote for death. It's just easier. I will give him life without parole?" In answering this question, J.B. said: "And if — it's unfortunate that if it's proven that he's guilty I have to go along with the law." The word "unfortunate" could indicate that J.B. "generally thought [the death penalty] was a verdict to avoid." (*Ibid.*) But in the context of the prosecutor's question, it could also mean that J.B.'s commitment to follow the facts and the law would deny her the "easier" option to "give him life without parole." In ordinary parlance, not

taking the "easier" option may be "unfortunate" in the sense that it is unfortunate (i.e., unpleasant, onerous) to do what is more difficult. J.B.'s statement is readily understood to mean that she thought the task of deciding whether a person should live or die is more difficult than simply voting for life imprisonment without parole — a view that (one hopes) is held no less by people who support the death penalty than by people who oppose it. That a person finds it "unfortunate" to have to decide between life and death does not necessarily mean the person has "an inherent discomfort with the death penalty." (*Ibid.*) Ultimately, it is unclear what J.B. meant by this snippet of her answer, and there is no indication that it raised any concern for the prosecutor.

Moreover, it is understandable why J.B.'s comment raised no concern. The comment is immediately followed by her statement: "I can't go by, This is what [J.B.] feels. I have to go by, This is the law, this is what he did, this is what was proven. And without a reasonable doubt I have to. I have to vote on it." This statement indicates that J.B. took her role as a juror seriously and intended to follow the law and the facts as presented in the case before her — exactly as we would expect a conscientious juror to do.

Today's opinion acknowledges that J.B.'s statements "have some ambiguity" and were accompanied by "other answers indicating [J.B.] *could* vote for the death penalty." (Maj. opn., *ante*, at pp. 42–43.) But it concludes that the "*combination*" of these statements "dispels whatever inference of discrimination might otherwise be thought to arise from" J.B.'s strike. (*Id.* at p. 44.) I find this reasoning unpersuasive. The fact that one "alternative interpretation[]" of J.B.'s individual comments could have provided "a reason why the

5

prosecution would not have wanted her on the jury" is insufficient to dispel an inference of discrimination. (*Id.* at p. 43.) In light of this, I do not see how the "*combination*" of J.B.'s "cruel" and "inhumane" comment and her "unfortunate" comment — each of which is ambiguous — could add up to an expression of "significant" reservations about the death penalty (*ibid.*), especially when the record contains no hint that either comment posed a concern for the prosecutor. Here, pairing one ambiguous statement with another produces two ambiguous statements; it does not rid the statements of their ambiguity.

More broadly, the court's parsing of a few select words from J.B.'s voir dire misses the overall thrust of her answers. The consistent and central theme of J.B.'s answers is that she was committed to deciding the case based on the facts proven at trial. J.B. expected expert witnesses to have their "facts down and be honest." She told the prosecutor that she would "go basically with the facts" and would "hold you to the facts." In addition to other attributes that arguably made her an attractive juror for the prosecution, including her repeated statements indicating she was willing to impose the death penalty, J.B. said, "I don't know the judicial system and how it works, but it [the evidence or the facts] must be pretty strong. We're all sitting here." I have appended the voir dire transcript so that readers can see the full context for themselves.

In sum, the totality of the relevant facts surrounding J.B.'s excusal gives rise to an inference of discrimination. That does not mean the prosecutor actually had a discriminatory purpose; it simply means that the trial court should have asked the prosecutor to explain why he excused J.B. and then analyzed the stated reasons. Nothing in J.B.'s responses made her a juror that "[a]ny reasonable prosecutor would logically wish to avoid."

(Maj. opn., *ante*, at p. 42.)  The court's speculative analysis of what motivated the prosecutor to excuse J.B. yields plausible conjectures.  But plausible conjectures are far from sufficient to "*necessarily* dispel any inference of bias," such that " 'there is no longer *any* suspicion . . . of discrimination in th[e] strike[].' " (*Scott*, *supra*, 61 Cal.4th at p. 384, italics added.)

## II.

Today's opinion, like other recent decisions, "illustrate[s] the imprecision of relying on judicial speculation to resolve plausible claims of discrimination." (*Johnson*, *supra*, 545 U.S. at p. 173; see *People v. Rhoades* (2019) 8 Cal.5th 393, 461–466 (*Rhoades*) (dis. opn. of Liu, J.); *People v. Harris* (2013) 57 Cal.4th 804, 871–879 (conc. opn. of Liu, J.).)  "[T]his mode of analysis — hypothesizing reasons for the removal of minority jurors as a basis for obviating inquiry into the prosecutor's actual reasons — has become a staple of our *Batson* jurisprudence, and it raises serious concerns.  'The *Batson* framework is designed to produce actual answers' — not hypothesized answers — 'to suspicions and inferences that discrimination may have infected the jury selection process.' (*Johnson v. California*, *supra*, 545 U.S. at p. 172.)  If an inference of bias is to be dispelled, it is up to the prosecutor to dispel it by stating credible, race-neutral reasons for the strikes.  It is not the proper role of courts to posit reasons that the prosecutor might or might not have had.  This case illustrates the problem:  By combing the record for 'readily apparent' reasons for the strikes (which, on close inspection, are not readily apparent at all), the court does exactly what *Johnson v. California* 'counsels against':  It 'engag[es] in needless and imperfect speculation when a direct answer can be obtained by asking a simple question.' (*Ibid.*)" (*Rhoades*, at p. 457 (dis. opn. of Liu, J.).)

7

The reasoning exemplified by today's decision has contributed to an unbroken pattern in our case law: "In the [16] years since Johnson v. California, this court has reviewed the merits of a first-stage Batson denial in [over] 42 cases, all death penalty appeals. [Citation.] Not once [has] this court [found] a prima facie case of discrimination — even though all [those] cases were tried before Johnson v. California disapproved the 'strong likelihood' standard and held that 'an inference of discrimination' is enough. In light of this remarkable uniformity of results, I am concerned that 'this court has improperly elevated the standard for establishing a prima facie case beyond the showing that the high court has deemed sufficient to trigger a prosecutor's obligation to state the actual reasons for the strike.'" (*Rhoades*, *supra*, 8 Cal.5th at p. 458 (dis. opn. of Liu, J.); see *id.* at p. 467 [documenting that 30 of this court's 42 *Batson* first-step decisions as of 2019 "rel[ied] on hypothesized grounds for contested strikes"]; *id.* at pp. 471–474, appen.)

"Equally remarkable is the fact that it has been more than 30 years since this court has found any type of *Batson* error involving the removal of a Black juror. (See *People v. Snow* (1987) 44 Cal.3d 216.) This is despite the fact that '[t]he high court's opinion [in *Batson*] responded specifically to the pernicious history of African Americans being excluded from jury service, calling such exclusion "a primary example of the evil the Fourteenth Amendment was designed to cure."' ([*People v.* ]*Hardy* [(2018)] 5 Cal.5th [56,] 124 (dis. opn. of Liu, J.), quoting *Batson, supra*, 476 U.S. at p. 85.)" (*People v. Johnson* (2019) 8 Cal.5th 475, 534 (dis. opn. of Liu, J.).) The United States Supreme Court recently recounted *Batson*'s origins as a doctrine to combat the exclusion of Black jurors.

(*Flowers v. Mississippi* (2019) 588 U.S. __, __–__ [139 S.Ct. 2228, 2238–2243].)   And the high court cited several cases, all involving Black jurors, to underscore that "[i]n the decades since *Batson*, this Court's cases have vigorously enforced and reinforced the decision, and guarded against any backsliding." (*Id.* at p. __ [139 S.Ct. at p. 2243], citing *Foster v. Chatman* (2016) 578 U.S. __ [136 S.Ct. 1737], *Snyder v. Louisiana* (2008) 552 U.S. 472, and *Miller-El v. Dretke* (2005) 545 U.S. 231). "Clearly, racial discrimination against Black jurors has persisted.  Yet no comparable record of vigorous enforcement appears in our case law over the same period.  (Cf. *People v. Gutierrez* (2017) 2 Cal.5th 1150 [this court's lone finding of *Batson* error in the past [20] years].)" (*People v. Johnson*, at pp. 534–535 (dis. opn. of Liu, J.).)

Because the passage of time makes impractical a remand to explore the prosecution's actual reasons for excusing J.B. (see *Snyder v. Louisiana*, *supra*, 552 U.S. at p. 486), the judgment of conviction must be reversed.  I respectfully dissent.

**LIU, J.**

## Appendix

BY [PROSECUTION]:

Q Good afternoon, ███.

A Good afternoon.

Q I see you have a background -- do you have a background in sociology and psychology?

A Yes, I do.

Q Could you tell me a little bit about that?

A Oh, during my college days when I majored in sociology, and when I received my masters it was in school psychology and school administration, so --

Q You work for the ███ School district; right?

A Yes.

Q Do you teach?

A Yes.

Q What do you teach?

A Kindergarten.

Q Do you like it?

A Absolutely.

Q Are you going to miss being away from the kids?

A Absolutely.

Q Is there anything about your background in school psychology or sociology that if a psychologist or psychiatrist were going to come testify you would automatically believe what they were telling you?

A No. I wouldn't say that, because I've been on a case before and we had a psychologist come in. And we had to weigh all the evidence that was brought and in,

and we had to analyze it, compare, contrast, the whole thing. And to be honest with you, I didn't believe him because I found out later after the trial -- but I'm glad I went with the gut feeling -- that they had just hired that psychologist like the day before or whatever, and they paid him a lot of money to come and testify.

And they didn't really know that person, and I didn't like that. I didn't like that they took our time to listen to this professional person and he really didn't know this person whose life was at hand. And I don't like dishonesty, and I didn't appreciate that part of it.

Q So you would want somebody that would consider all of the facts?

A I would want someone in here that knows exactly what they're talking about because this young man's life is on the line. And he's a young man, and don't come in here shucking and driving. Have your facts down and be honest, because we all have other things to do. And we didn't come here to travel this far to listen to someone who didn't do their homework.

Q Right. And you've expressed some concern in this case because you said a young man's life is on the line?

A Yes.

Q Does that fact, the fact that you're going to be asked to judge, first of all, whether or not this person committed first degree murder and the special circumstances are true, and then if you get beyond that,

to weigh some aggravating and mitigating factors to determine whether or not this defendant deserves the death penalty, because of your concerns about that, do you feel you're the kind of person that in a given situation could impose the death penalty?

A I could if he's guilty.

Q Okay. I think you wrote in your questionnaire that you thought perhaps that the death penalty was inhumane or cruel?

A I feel that way when -- I feel that way when I've read articles about -- I would say, for instance, the inmates in Texas. And a lot of them have been proven innocent based on the DNA and then they were given the death penalty. I feel that part was -- I didn't like that part because they were found guilty, they went -- you know, they were facing death and 20 years later they found out they didn't do it. And I just felt that that was so inhumane to execute someone for something that they didn't do.

Q Right. No. And I think everybody would agree with you.

Is that something that's going to be on your mind, what happened in Texas, that's going to cause you or give you some concern if you reach the penalty phase in this case where you say, Well, I know about perhaps there have been some innocent people that have been put on death row. I don't want to make that mistake; I'm not going to vote for death. It's just easier. I will

give him life without parole?

A No. Because I have to live with myself, and I go with my first feeling and I go with basically facts. And if -- it's unfortunate that if it's proven that he's guilty I have to go along with the law. There's -- I can't go by, This is what [J.B.] feels. I have to go by, This is the law, this is what he did, this is what was proven. And without a reasonable doubt I have to. I have to vote on it.

Q No problem being somebody in the back, being part of the group that decides, Hey, death is the appropriate sentence and coming back out here looking at the defendant and telling him so?

A No. I don't have a problem with that. I'm my own person. I don't let anyone sway me right or left. I have to go by what I feel.

Q Okay.

A And if they have a problem with that, then that's on them.

Q You talked about the standard or the burden of proof in this case beyond a reasonable doubt?

A Um-hm.

Q Because of the type of case that it is?

A Um-hm.

Q Are you going to hold me to a higher standard?

A I'm going to hold you to the facts.

Q And if the facts are -- you'll go wherever the facts take you. Is that what you're --

A If you prove to me that your facts are against him and you've proved your case, then I have to go with what I feel.

Q What about the fact that I don't have any eye witnesses, that I'm going to have to do this circumstantially and through things that the defendant says in some of his interviews? Does that bother you?

A No. Not if you don't have witnesses because you have something else that's stronger or maybe even better than a witness. I don't know because I don't know the judicial system and how it works, but it must be pretty strong. We're all sitting here.

Q Okay.

What about in voting for death? The Court has told you that there's some aggravating factors, some mitigating factors. Do you think sometimes or in your mind can you conceive of some circumstances where just the facts of the crime itself are so bad that a person deserves death?

A Would I have a problem --

[DEFENSE]: I object to that as an improper question.

THE COURT: Can you restate that?

[PROSECUTION]: Sure.

BY [PROSECUTION]:

Q Do you think there are some cases where the circumstances themselves are so bad that they would outweigh anything else?

[DEFENSE]: It's asking prejudgment.

THE COURT: I think so.

[PROSECUTION]: It's not using any particular facts.

THE COURT: The objection is sustained.

BY [PROSECUTION]:

Q Anything else we talked about that came to your mind when you heard those other questions?

A No. Nothing -- nothing right now.

[PROSECUTION]: Okay. Thank you very much. Pass for cause, your Honor.

THE COURT: Thank you.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Battle

---

<u>**Procedural Posture**</u> (see XX below)
**Original Appeal**  XX
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished**
**Rehearing Granted**

---

**Opinion No.** S119296
**Date Filed:** July 1, 2021

---

**Court:**  Superior
**County:**  San Bernardino
**Judge:**  Eric M. Nakata

---

**Counsel:**

Michael J. Hersek and Mary K. McComb, State Public Defenders, under appointments by the Supreme Court, Nina Rivkind, Heidi Bjornson-Pennell and Elias Batchelder, Deputy State Public Defenders, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Gerald A. Engler and Lance E. Winters, Chief Assistant Attorneys General, Julie L. Garland and James William Bilderback II, Assistant Attorneys General, Holly D. Wilkens, Eric A. Swenson and Michael Pulos, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Elias Batchelder
Deputy State Public Defender
111 Broadway, 10th Floor
Oakland, CA 94607
(510) 267-3300

Michael Pulos
Deputy Attorney General
600 W. Broadway, Suite 1800
San Diego, CA 92101
(619) 738-9041